FILED

2010 Nov-29  PM 01:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JENNIFER HALL and JOSE ROCHA, individually and on behalf of all others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Civil Action No. CV-07-S-484-NW** |
| **PHYLLIS THOMAS and GLORIA FISHER,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Jennifer Hall and Jose Rocha, formerly worked as hourly-wage employees in the Russellville, Alabama poultry processing plant originally owned by Gold Kist, Inc., but subsequently acquired by Pilgrim's Pride Corporation.[1]  More than three years ago, plaintiff Jennifer Hall commenced this suit as a putative class action, alleging that, over the four years preceding the date of her complaint, defendants, Phyllis Thomas and Gloria Fisher, conspired "with their fellow Gold Kist and Pilgrim's Pride facility human resources . . . personnel" at several named and

---

[1] Doc. no. 49 (Second Amended Complaint), ¶¶ 1-2, 1 n.1.  Hereinafter, references to Pilgrim's Pride will refer to both entities, unless otherwise noted.

unnamed facilities in multiple locations across the country[2] for the purpose of "depress[ing] the Class' wages by knowingly employing large numbers of illegal immigrants . . . ."[3]  Plaintiffs' claims are based upon the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961-1968 ("RICO").

In addition to the criminal sanctions provided by RICO, *see* 18 U.S.C. § 1963(a),[4] Congress declared that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . . ."  18 U.S.C. § 1964(c).  Section 1962 makes it illegal to participate in a RICO "enterprise" that engages in a "pattern of racketeering activities," or to

---

[2] *See* doc. no. 1 (Original Complaint), ¶ 9 (filed March 16, 2007) ("Ms Hall brings this action on behalf of herself and all other persons legally authorized to be employed in the U.S. who have been employed at all Gold Kist and Pilgrim's Pride Facilities nationwide, as hourly wage earners in the last four years . . . ."); doc. no. 49 (Second Amended Complaint), ¶¶ 2 n.2, 3.

[3] Doc. no. 49 (Second Amended Complaint), ¶¶ 1-2; *see also* doc. no. 1 (Original Complaint), ¶¶ 1-2.  When filed, the suit was originally styled such that Hall was the sole class representative. *See id.* at 1.  Plaintiff Rocha first appeared well over a year after the case was filed, in the Second Amended Complaint (filed May 2, 2008), on the very last day permitted under the Scheduling Order for addition of parties.  *See* doc. no. 49 (Second Amended Complaint), at 1; doc. no. 46, at 3-4 (First Revised Scheduling Order).  Individual defendant Gloria Fisher also was first named as such in the Second Amended Complaint.  Doc. no. 49 (Second Amended Complaint), at 1.  Additionally, original individual defendant Paul White was dismissed from this action, by stipulation but without explanation, on July 28, 2008.  *See* doc. no. 80; Order Entered on July 28, 2008 (acknowledging the dismissal and terminating White).

[4] 18 U.S.C. § 1963(a) provides, in part, that "[w]hoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment). . . ."  The statute also contains extensive forfeiture sanctions.  *See id.* §§ 1963(a)(1) – (a)(3).

"conspire" to do so.  18 U.S.C. § 1962(c)-(d); *see also Beck v. Prupis*, 529 U.S. 494,

506 (2000) (stating that, to prove a violation of the conspiracy provision, 18 U.S.C.

§ 1962(d), plaintiff must show that defendants (1) knowingly and willfully joined a

conspiracy (2) with the purpose of violating 18 U.S.C. § 1962(c)).  To establish the

requisite "pattern of racketeering activity," a plaintiff must demonstrate the

"commi[ssion] of at least two distinct but related predicate acts." *Edwards v. Prime,*

*Inc.*, 602 F.3d 1276, 1292 (11th Cir. 2010) (bracketed alteration added) (quoting

*Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006)).

In this case, the predicate acts plaintiffs claim defendants or their co-

conspirators engaged in are violations of two provisions of § 274 of the Immigration

and Nationality Act ("INA") which — provided plaintiffs can prove that the

violations were for financial gain — are defined in RICO as predicate acts.  *See* 18

U.S.C. § 1961(1)(F).  Specifically, plaintiffs claim defendants violated 8 U.S.C. §

1324(a)(3)(A), which makes it a federal crime to "knowingly hire[] for employment

at least 10 individuals with actual knowledge" that those individuals were illegal

aliens and were brought into the country illegally, and § 1324(a)(1)(A)(iii), which

makes it a federal crime to knowingly or recklessly "conceal[], harbor[], or shield[]

from detection" an alien who "has come to, entered, or remains in the United States"

illegally. 8 U.S.C. § 1324(a)(1)(A)(iii); *id.* § 1324(a)(3)(A); *see also Edwards*, 602

F.3d at 1292-94, 1297-1300 (interpreting these provisions in the RICO context).

"RICO claimants . . . must [also] show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Williams*, 265 F.3d at 1283.   Plaintiffs' theory of damages is that defendants' alleged hiring and/or harboring depressed their wages below what they otherwise would have been.[5]

This action is currently before the court on five motions:   (1) defendants' motion for summary judgment;[6] (2) defendants' motion to exclude the testimony of Dr. George J. Borjas, plaintiffs' expert witness;[7] (3) defendants' motion to exclude the testimony of James M. Johnston, another of plaintiffs' expert witnesses;[8] (4) plaintiffs' petition for further discovery pursuant to Federal Rule of Civil Procedure 56(f);[9] and (5) plaintiffs' motion to amend the scheduling order.[10]

## I.  BACKGROUND

Because the disposition of the motions before this court and, ultimately, the action itself, turns purely on whether plaintiffs have sustained their burden of proving

---

[5] Doc. no. 49 (Second Amended Complaint), ¶¶ 2, 5-6.

[6] Doc. no. 104 (Defendants' Motion for Summary Judgment).

[7] Doc. no. 105 (Defendants' Motion to Exclude the Testimony of George Borjas).

[8] Doc. no. 106 (Defendants' Motion to Exclude the Testimony of James M. Johnston).

[9] Doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit).

[10] Doc. no. 149.

the reliability of their experts, and of providing evidence giving rise to a genuine issue of material fact regarding the technical requirements of the statutory provisions under which they brought suit, recitation of the factual narrative would be both unnecessary and largely unhelpful.  Accordingly, the court will dispense with the usual statement of disputed and undisputed facts and address those few facts that are relevant to the substantive determinations in the analysis that follows.

## A.    Procedural History of the Case

Before delving into the merits of the motions and the substance of the contested testimony, however, it behooves the court to untangle the tortuous procedural history that has placed this case in its present and, as plaintiffs correctly put it, "unique procedural posture."[11]  A great deal of water has gone under the bridge since this case was filed.  That necessarily must factor into whether this court should countenance plaintiffs' request for further discovery, to permit their damages expert to produce the evidence of proximate causation of damages to business or property necessary to establish their *prima facie* case.[12]

---

[11] Doc. no. 149, at 4.

[12] *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[A] claim is cognizable under [RICO's private right of action provision, 18 U.S.C.] § 1964(c)[,] only if the defendant's alleged violation proximately caused the plaintiff's injury [to business property]."); *see also Eleventh Circuit Pattern Jury Instructions* — Civil, Federal Claims Instruction 5.1, at 342 (2005) (stating that, to justify a verdict for a plaintiff in a civil RICO case, a jury must "decide whether the Plaintiff has suffered injury in [his/her/its] business or property as a 'proximate result' of the Defendant's pattern of racketeering activity.  To be the 'proximate result' of such activity it must be proved that, except

Plaintiffs filed their initial complaint, putatively on behalf of a nationwide class, on March 16, 2007.[13]  The complaint asserted that current and former Human Resources personnel at Gold Kist and Pilgrim's Pride chicken processing facilities across the country engaged in a nationwide conspiracy to knowingly employ illegal immigrants in order to depress the wages of native unskilled laborers, like plaintiffs.[14]  In sum and substance, these are the very same factual allegations plaintiffs asserted in their Second Amended Complaint, filed more than a year later on May 2, 2008.[15]

On May 7, 2007, defendants — who are individual managers or Human Resources personnel at the Pilgrim's Pride processing facility in Russellville, Alabama[16] — moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief could be granted.[17]

---

for such activity by the Defendant, the injury or damage claimed by the Plaintiff would not have occurred.").  *See also* doc. no. 31 (Memorandum Opinion Denying Motion to Dismiss), at 44 (discussing the difficulties of establishing proximate causation of damages in cases of this variety).

[13] *See generally* doc. no. 1 (Original Complaint).  *Note*: for much of the initial phase of this suit, plaintiff Hall was the only named plaintiff, though the caption did indicate the existence of other plaintiffs in the form of an asserted class.  *See supra* note 3.  Plaintiff Rocha was added in the Second Amended Complaint.  To avoid confusion, this opinion will refer to "plaintiffs" in the plural regardless of whether there were in fact two named plaintiffs at the moment in question.

[14] Doc. no. 1 (Original Complaint), ¶ 1; doc. no. 49 (Second Amended Complaint), ¶ 2.

[15] *See generally* doc. no. 49 (Second Amended Complaint).  The date this document was filed was the final date for amendment of the pleadings.  *See* doc. no. 46 (First Revised Scheduling Order), at 3 (setting the deadline for amending the pleadings as May 2, 2008).

[16] *See* doc. no. 1 (Original Complaint), ¶ 2 & n.1; doc. no. 49 (Second Amended Complaint), ¶ 2.

[17] Doc. no. 9.

6

Twenty-three days later, defendants took the unorthodox step of also moving for summary judgment, contending, among other things, that the allegations in this action were without foundation and were simply copied — virtually verbatim — from at least three other complaints filed by one of plaintiffs' attorneys in other United States District Courts within the six months preceding the filing of plaintiffs' complaint in this case.[18]  Defendants then moved, on June 12, 2007, to stay discovery pending determination of their motion to dismiss.[19]

In an order dated June 22, 2007, this court denied as premature defendants' motion for summary judgment and, pursuant to the general rule in this Circuit, stayed discovery pending decision on defendants' motion to dismiss.[20]  Thereafter, plaintiffs

---

[18] Doc. no. 18, Ex. 1, at 34-57; *see id.* at 55-57 ("Indeed, not only is the alleged 'hiring criteria' identical in all four complaints, but attorney Foster failed to correct the same mis-citation . . . of the Immigration and Nationality Act in all of the complaints."); *e.g.*, doc. no. 18, Ex. D (Complaint in *Hernandez v. Balakian*, No. CV-F-06-1383 OWW/DLB (E.D. Cal.)) (filed Oct 5, 2006), Ex. E (Complaint in *Marin v. Evans*, No. CV F 06-01324 AWI DLB (E.D. Wash)) (filed September 28, 2006), Ex. F (Denial of Motion to Dismiss in *Brewer v. Salyer*, No. CV F 06-01324 AWI DLB (E.D. Cal.)) (complaint filed Sept. 21, 2006). *See also, e.g.*, *Brewer*, 2009 WL 1396148, at 6 ("The court recognizes that this action is one of many 'civil RICO actions that have been filed in various courts across the nation, capitalizing on the popular outcry against undocumented aliens who are working openly in the United States.'  As such, it is probably not unreasonable to characterize Plaintiff's action as *'boilerplate' or constructed of 'recycled' allegations.*") (quoting *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 529 (S.D.N.Y. 2009) (yet another nearly identical case)) (emphasis supplied); *compare* Complaint, *Walters v. McMahen*, 1:10-cv-257-MEF-CSC (M.D. Ala., Mar. 22, 2010) (plaintiffs' counsel including plaintiffs' lead counsel in this case, Howard Foster) *and* Complaint, *Broussard v. Maples*, No. 09-S-01563-NE (N.D. Ala., Aug. 04, 2009) (plaintiffs' counsel including Foster), *with* doc. no. 49 (Second Amended Complaint) (containing numerous verbatim, cut-and-paste paragraphs).

[19] Doc. no. 22.

[20] Doc. no. 26; *see id.* at 5 ("[I]t appears that the *only* proper course, when presented with a request to stay discovery pending resolution of a motion to dismiss, is to grant the stay.") (citing

filed a motion for modification of the stay based on what appeared on its face to be the sealed affidavit of an immigration agent created in aid of an ongoing criminal investigation.[21]  On February 12, 2008, the court heard oral arguments regarding the pending motions and, subsequently, filed a memorandum opinion and order denying defendants' motion to dismiss and lifting the stay on discovery.[22]  However, noting that the Eleventh Circuit had, in a very similar case (also brought by the same attorney for the plaintiffs), expressed serious concerns with the "particularly difficult proximate causation issues [that] may be presented where a plaintiff alleges nationwide injury" in the form of wage depression resulting from alleged illegal hiring, the court "limited [discovery] to those facts (if any) substantiating plaintiff's allegations of a RICO conspiracy at the Russellville, Alabama Pilgrim's Pride facility."[23]  *Cf. Williams*, 465 F.3d at 1290; *see also Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 619 (6th Cir. 2004) (stating, in yet another similar case brought by plaintiffs' counsel, that "[i]n the face of the[] attenuated links in the chain of causation, [defendant] asserts [that] plaintiffs cannot show proximate cause.  [They] may be right — but we cannot say so at this [12(b)(6)] stage in the proceeding.").

---

*Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997)).

[21] Doc. no. 27; doc. no. 27, Ex. A (Plaintiffs' First Rule 56(f) Affidavit).

[22] Doc. no. 31 (Memorandum Opinion Denying Motion to Dismiss); doc. no. 32 (Order Denying Defendants' Motion to Dismiss).

[23] Doc. no. 31 (Memorandum Opinion Denying Motion to Dismiss), at 42-44.

The order made clear that only upon demonstration of a *prima facie* case as to that locale would the court consider broadening the scope of discovery nationwide.[24]

Four days after plaintiffs filed their amended complaint, as required by the same order that denied the motion to dismiss, this court entered the first Scheduling Order governing the initial phase of discovery.[25]  According to that order, plaintiffs were required to designate and submit their expert reports by April 21, 2008, and all discovery was due to be concluded no later than May 30, 2008.[26]  A week later, one day before the parties filed the report of their Rule 26(f) meeting,[27] plaintiffs filed their first motion to extend the time for designating expert witnesses.[28]  As defendants noted in their opposition to plaintiffs' motion for extension of time, many of the rationales asserted by plaintiffs to explain why they believed further time was necessary involved uncertainty about facts into which plaintiffs could have made significant inquiry even without discovery, and facts that would seem central to a good faith basis for filing suit in the first instance.[29]  Plaintiffs also asserted, in the

---

[24] *See* doc. no. 31 (Order Denying Motion to Dismiss), at 2-3.

[25] Doc. no. 35 (First Scheduling Order).

[26] *Id.* at 1-2.

[27] *Compare* doc. no. 41 (filed April 1, 2008), *with* doc. no. 43 (Report of Parties' Planning Meeting) (filed April 2, 2008).

[28] Doc. no. 41.

[29] Doc. no. 42; *see also* doc. no. 41 ("Plaintiff's selection of an expert(s), who will offer opinions about hiring illegal immigrants will be determined by numerous factors including: whether or not the Russellville facility used recruiters to locate potential employees, whether it had been subjected to enforcement actions by the federal officials for prior immigration violations, the degree

Rule 26(f) meeting, that they would undertake no discovery with respect to damages or proximate causation whatsoever, arguing that the court's orders did not require them to establish those two elements of a *prima facie* case.[30]

On April 9, 2008, this court entered a Revised Scheduling Order, making clear that the parties were "to fully explore *all aspects* of plaintiffs' RICO claim as it relates to the Russellville, Alabama, poultry processing facility during this limited period," including proximate causation of damages resulting from the alleged RICO predicate acts.[31]  The order stated in no uncertain terms that the initial discovery period was intended to permit plaintiffs to establish a case, supported by sufficient facts on all elements of their claim to survive a motion for summary judgment.[32]  That order also extended the discovery period through the month of June and, consistent with plaintiffs' requests, provided them one further month in which to designate and file reports of their expert witnesses.[33]  In so doing, the court warned that the expert deadlines would not again be altered except for good cause shown.[34]

---

to which the Defendants have autonomy to set hiring criteria[,] and[] the prevalence of illegal immigrants in the local area.").

[30] Doc. no. 43, at 2.

[31] Doc. no. 46 (First Revised Scheduling Order), at 2 (emphasis in original); *see also id.* at 3, n.5.

[32] *Id.* at 3, n.5.

[33] *Id.* at 4-5.

[34] *Id.*

Nonetheless, one day prior to the expiration of the revised expert designation deadline, plaintiffs moved to extend the deadlines for their experts' reports yet again — seeking a one-week extension for their immigration expert, and three weeks extension for their damages and proximate causation expert.[35]  Plaintiffs asserted that "good cause" existed for extending the deadline for the report of Dr. George J. Borjas, their damages expert, because the public data upon which he had intended to rely had proven insufficient.[36]  Despite over forty-five pages of briefing on the extension, plaintiffs provided only a cursory explanation of why the adequacy of publicly-available data to inform the analysis necessary to support their claims could not have been determined during the fourteen months the case had already been pending.[37]  They also failed to explain why they waited until the eleventh hour, more than a month and a half after entry of the revised scheduling order, to request an extension on that basis.[38]  Nevertheless, in an effort to afford plaintiffs every opportunity to

---

[35] Doc. no. 55, at 2.

[36] *Id.*

[37] *See* doc. no. 56, at 6 ("Defendants are . . . disturbed that Plaintiffs apparently filed this lawsuit against them in March of 2007 when the 'publicly available data' 'was not sufficient' to support their damages theory."); doc. no. 57, at 1-2 ("[E]ach 'wage depression' case that Plaintiffs' counsel has been involved in is different in a host of ways, including:  the geography, the relevant labor market, the type and scope of data available, the size of the employer, the particular industry, the number of plaintiffs, demographics, etc.  As such, until Plaintiffs' expert began his analysis, he could not determine whether the data available would be sufficient to estimate the amount Plaintiffs' wages were depressed . . . .").

[38] Further, plaintiffs claimed that the extension was necessary to permit responses to subpoenas issued to ten local businesses, apparently in noncompliance with the notice provisions of

uncover the evidence necessary to establish their *prima facie* case, the court granted plaintiffs' motion, providing plaintiffs until June 11, 2008, to tender the report of their damages expert, and until July 10 for the completion of all discovery.[39]

Even so, on June 17, 2008, nearly a week *after* the date by which plaintiffs were to have tendered their damages expert's report, the parties filed yet another motion to extend the expert deadlines.[40]  No reason at all was given as to why the deadline should be extended for Dr. Borjas's report.[41]  Yet again, however, the court revised the schedule, "with even more liberal deadlines," but with the *caveat* that, "absent compelling and unforeseen circumstances, this third order granting an extension of time shall be the last."[42]  Plaintiffs were given until July 22, 2008 to tender the "complete report" of Dr. Borjas.[43]  The order stated that all discovery was

---

Rule 45(b)(1).  *See* doc. no. 59, at 7 ("Plaintiffs did not provide Defendants with such notice [as Rule 45(b)(1) requires] until Defendants learned about those subpoenas by reading Plaintiffs' Sur-Reply.").  They failed to explain why these additional subpoenas were propounded so late in the game when subpoenas requesting the same information had been sent to two of the ten more than a month prior to plaintiffs Motion to Extend.  *See* doc. no. 56, Exs. A & B.

[39] Doc. no. 60, at 1-2.

[40] Doc. no. 67, at 2.

[41] *Id.* at 1-2 (restricting the discussion entirely to explaining problems purportedly encountered regarding document production for plaintiffs' immigration expert).  The court acknowledges that the proper possessive form of "Borjas," at least according to conventional wisdom, is "Borjas's."  *See* Bryan A. Garner, *The Elements of Legal Style* 20 (2d ed. 2002) ("Form singular possessives by adding 's to the singular form of the noun.  The rule holds true regardless of how the word ends:  thus, *witness's*, *Jones's*, *Congress's*, and *testatrix's*.")

[42] Doc. no. 69.

[43] Doc. no. 70 (Final Revised Scheduling Order), at 2.

to be completed by August 8, 2008.[44]

Extraordinarily, even though this court had thrice extended the deadline for Dr. Borjas' report, providing plaintiffs with more than three extra months beyond the due date set in the original scheduling order, the parties provided the following notice, once more approximately a week *after* Dr. Borjas' report was due:

> To date Defendants have only been provided with Plaintiffs' damages expert report. They have not been provided with the Plaintiffs' damages expert's supporting documentation, regression analysis and computer data and other information he relied upon or reviewed [as required by Rule 26(a)(2)(B)(i)-(ii)]. Plaintiffs' counsel has represented that Defendants should receive all of such information by Tuesday, July 29, 2008. Plaintiffs' counsel has further represented that the provision of such documentation and information has been delayed because of technical issues in downloading Plaintiffs' experts' regression analysis programs to a c.d.

Though "not at all impressed with the reasons proffered by plaintiffs' expert for the delay," this court recognized that plaintiffs' failure had deprived defendants' damages expert of the time that the supposedly "Final Scheduling Order" had provided for his analysis of Dr. Borjas's report.[45]  Consequently, and in light of the joint nature of the motion to revise the schedule, the court granted yet another extension.[46]  That order extended the deadline for completion of all discovery to August 29, 2008.[47]

---

[44] *Id.* at 1.

[45] Doc. no. 85, at 1-2.

[46] *Id.*

[47] *Id.* at 2.

13

As it turned out, not only were plaintiffs' explanations for the delay in turning over the bases for Dr. Borjas's report unimpressive, they were also false. Dr. Borjas never created a regression analysis for this case at all,[48] so there were no technical problems associated with downloading it. Moreover, while some of the promised data underpinning the report were indeed turned over within the timeframe described in this fourth motion to extend, plaintiffs appear not to dispute that portions of the data were not turned over until September 16, 2008, more than two weeks after the deadline for completion of discovery.[49]

Almost immediately, on August 5, 2008, defendants filed a so-called "preliminary" motion to strike Dr. Borjas's report, for summary judgment on damages and proximate causation, and to stay discovery, on the basis that Dr. Borjas's report

---

[48] *See, e.g.*, doc. no. 105, Ex. A (Expert Report of George Borjas, Ph.D.) [hereinafter Borjas Report], ¶ 45 ("Because of these data limitations, it has not yet been possible to estimate the statistical model summarized above."); doc. no. 105, Ex. D (Deposition of George J. Borjas, Ph.D) [hereinafter Borjas Deposition], at 104 (Dr. Borjas states that he "did not pursue [the regression analysis]" because "[i]t would not be something that one would present," given the data he reviewed); *id.* at 90-94 (stating that, despite having run statistical programs based upon the data he was given, he did not provide a statistical analysis alongside his report because the "data contradict[ed] what . . . was expected to happen in terms of employment as a result of the entry of an unauthorized worker in the labor market"); Transcript of *Daubert* Hearing Held April 27, 2010 [hereinafter *Daubert* Hearing Transcript], at 183 (Dr. Borjas: "I've never actually done the analysis in the sense of estimating the regression model.").

[49] *See* doc. no. 105 (Motion to Exclude the Testimony of George Borjas), at 14; doc. no. 105, Ex. C (Declaration of Defendant's Counsel Adam T. Dougherty), at 12; doc. no. 106, Ex. C, Ex. 3, at 1 (letter requesting further information not yet produced dated September 10, 2010).

was fatally incomplete.[50]  In that motion, defendants explicitly "reserve[d] their rights to more fully brief" plaintiffs' asserted failure to prove damages and causation in subsequent *Daubert* and summary judgment motions "should it be necessary."[51] When the motion was filed, more than three weeks remained in the discovery period,[52] defendants' damages expert's complete report had not yet been tendered,[53] and neither Dr. Borjas nor defendants' damages expert had yet been deposed.[54] Considering the motion decidedly premature, the court summarily denied it ten days after it was filed.[55]

On September 22, 2008, defendants filed three of the motions presently under consideration:   (1) a motion to exclude the testimony of James M. Johnston, plaintiffs' immigration expert; (2) a motion to exclude the testimony of Dr. Borjas, plaintiffs' damages and proximate causation expert; and (3) a motion for summary

---

[50] Doc. no. 87 ("Defendants' Preliminary Motion to Strike Plaintiffs' Damages Expert's Report, Preliminary Motion for Summary Judgment on Damages and Proximate Causation, and Motion to Stay, or in the Alternative, Request for Expedited Ruling"), at 4-8.

[51] *Id.* at 1.

[52] *Compare* doc. no. 87 (filed August 5, 2008), *with* doc. no. 85 (setting the deadline for completion of discovery as August 29, 2008).

[53] *See* doc. no. 85, at 2 ("Defendants' damages expert is therefore allowed until August 12, 2008, to tender his rebuttal report.").  *Compare* doc. no. 87, Ex. B (Preliminary Declaration of Finis Welch, Ph.D., signed and sworn August 4, 2008), *with* doc. no. 105, Ex. H (Declaration of Finis Welch, Ph.D., signed and sworn August 12, 2008) [hereinafter Welch Declaration].

[54] *See* Borjas Deposition, at 1 (dated August 26, 2008); doc. no. 105, Ex. H (Deposition of Finis Welch, Ph.D.), at 1 (dated August 28, 2008).

[55] Doc. no. 93.

15

judgment.[56]  The briefing regarding these motions concluded on October 27, 2008.[57]

On December 1, 2008, Pilgrim's Pride filed for bankruptcy protection under Chapter 11, in the Bankruptcy Court for the Northern District of Texas.[58]  While, technically, Pilgrim's Pride is not a party, the company has factually been at center stage in this action and, moreover, has paid the litigation fees associated with defending the two individual defendants from the outset.[59]  Therefore, not surprisingly, nearly a year passed during which this court saw neither hide nor hair of either party, save for occasional administrative filings related to counsel.

The court attempted to jump start the stagnant litigation on October 8, 2009, by setting the two outstanding motions to exclude for a hearing one month and ten

---

[56] Doc. no. 104 (Motion for Summary Judgment); doc. no. 105 (Motion to Exclude the Testimony of George Borjas); doc. no. 106 (Motion to Exclude the Testimony of James M. Johnston).

[57] *See* doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas); doc. no. 110 (Response to Motion to Exclude the Testimony of James M. Johnston); doc. no. 111 (Response to Motion for Summary Judgment) (all filed October 15, 2008); *see also* doc. no. 113 (Reply in Support of Motion to Exclude the Testimony of James M. Johnston); doc. no. 114 (Reply in Support of Motion to Exclude the Testimony of George Borjas), doc. no. 115 (Reply in Support of Motion for Summary Judgment) (all filed October 27, 2008).

[58] *See* doc. no. 126, ¶ 4; *see also, e.g.*, *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 232 (Bankr. N.D. Tex. 2009) ("Debtors commenced these chapter 11 cases on December 1, 2008, by the filing of voluntary chapter 11 petitions.").

[59] *See, e.g.*, doc. no. 126, ¶ 5 ("Pilgrim's Pride believes that payment of the Defendants' defense costs and the engagement of the undersigned firm as counsel is permissible as an action in the ordinary course of its business as a debtor-in-possession under 11 U.S.C. § 363(c)."); *Daubert* Hearing Transcript, at 272 ("Your Honor, in the bankruptcy court we had to seek authorization to even represent the debtor and its interest.  The debtor is Pilgrim's Pride Corporation, which, as you know, is clearly paying our legal fees, although we represent the two individuals.").

days later.[60]   Counsel for both parties, however, left a telephone message with

chambers on October 26, 2009,[61] stating that they would be unable to attend, and,

three days later, plaintiffs filed a motion to continue the evidentiary hearings.[62]

Defendants' counsel responded on the same day, suggesting the hearing be continued

indefinitely, pending the determination of an as-yet-unfiled motion in the bankruptcy

court to permit them to continue representation of defendants.[63]   Recognizing that,

without an authorization order from the Bankruptcy Court, defendants' counsel could

be forced to withdraw, this court granted a continuance of the *Daubert* hearing on

November 2, 2009, directing counsel to notify the court regarding the progress of that

motion.[64]

On December 7, 2009, defendants gave notice that the Bankruptcy Court had

---

[60] *See* Clerk's Notice of October 8, 2009.

[61] *See Daubert* Hearing Transcript, at 271-72.

[62] Doc. no. 125.

[63] Doc. no. 126, ¶ 7-9.  Defendants' counsel noted that, not only was a clarification from the bankruptcy court necessary to ensure it was permissible to utilize Pilgrim's Pride to fund the defense of non-debtors (though obviously in an action that could heavily impact the bankruptcy estate), it was also necessary to ensure the other parties-in-interest in the estate did not object to the concurrent representations of Pilgrim's Pride in the bankruptcy proceedings and defendants in this action on the basis of potential conflicts of interest. *Id.* ¶ 5; *see also* doc. no. 131, Ex. A, at 3 (copy of the Bankruptcy Court's order granting the motion to authorize use of the property of the bankruptcy estate to "pay legal costs of employees in pending RICO action" and permitting Baker & McKenzie to defend the employees; "ORDERED that [Baker & McKenzie, LLP] is authorized to defend the Employees in the RICO Action; *provided, however*, . . . that [Baker & McKenzie] shall notify the Debtors if the concurrent representation . . . rises to the level of a conflict of interest . . . so that the Debtors can find replacement counsel for the Employees . . . .").

[64] Doc. no. 129; *see also* doc. no. 130, Ex. A (copy of the Motion for Authorization to Use the Property of the Estates filed in the Bankruptcy Court for the Northern District of Texas).

granted their motion.[65]   Yet, one week later, the parties filed a joint motion to continue the *Daubert* hearing "until after 'Plaintiffs' Objection to Debtors' Amended Joint Plan of Reorganization under Chapter 11 . . . filed by Pilgrim's Pride . . .' [was] resolved."[66]   The motion alerted the court that, shortly after the date upon which the court continued the *Daubert* hearing and the date upon which the Bankrtupcy Court authorized defendants' counsel to continue representation in the bankruptcy case, plaintiffs' counsel had filed objections to the plan filed in the Bankruptcy Court.[67] Accordingly, the parties jointly requested that no hearing date be set until the dispute regarding Pilgrim's Pride's Reorganization Plan had been resolved.[68]

Before the parties notified the court about such a resolution, however, on February 3, 2010, plaintiffs filed a "Motion to Strike Defendants' Experts' Declarations and Deposition Transcripts and to Decide Defendants' *Daubert* Motions without a Hearing."[69]   Plaintiffs contended that defendants' suggestion that they would not introduce the live testimony of defendants' experts at the hearing on defendants' motion to exclude the testimony of plaintiffs' experts meant defendants were not entitled to use the declarations or deposition testimony of the experts they

---

[65] Doc. no. 131.

[66] Doc. no. 134, at 1.

[67] *Id.* ¶ 4.

[68] *Id.* ¶ 5.

[69] Doc. no. 137.

had retained in this action for any purpose.[70]  In addition to providing no citation even remotely supporting the relief sought, plaintiffs' motion was also, as a motion to strike expert testimony, nearly a year and a half tardy.[71]  The motion was denied on February 19, 2010.[72]

On March 5, 2010, the parties filed a joint notice regarding the status of the action.[73]  That document alerted the court about the following occurrences in the Bankruptcy Court.[74]  On January 1, 2009, Pilgrim's Pride moved to extend the automatic stay in the bankruptcy action to include all pending litigation that would use its resources, including this case.[75]  Plaintiffs filed a response in opposition on February 3, 2009.[76]  On March 3, 2009, the bankruptcy court declined to extend the stay and instead permitted the litigation to be addressed through the adversary

---

[70] *Id.* at 1-2, 11 ("In conclusion, Plaintiffs respectfully request an order striking the expert Declarations (reports) of the Defendants' two experts . . . as well as their deposition transcripts.").

[71] *See* doc. no. 85, at 2 ("*Daubert* motions must be filed no later than September 22, 2008. No further extensions will be granted.").  Moreover, the position was entirely inconsistent with plaintiffs' counsels' prior suggestion that even the experts whose testimony defendants sought to exclude need not attend the hearing.  *See* doc. no. 125, ¶ 2 (suggesting that their experts would appear only "if necessary").

[72] Doc no. 140.

[73] Doc. no. 141.

[74] The full docket of the Bankruptcy proceedings, which includes several thousand documents, is collected in the Bankruptcy Court for the Northern District of Texas, at *In re Pilgrim's Pride Corporation, et. al*, No. 08-45664 (DML) (Bankr. N.D. Tex.) .

[75] *See* doc. no. 141, at 2.

[76] *Id.*

19

proceeding process in that court.[77]   Such a proceeding was, however, never initiated with respect to this action.[78]   Pilgrim's Pride and the related entities who were debtors-in-possession in the bankruptcy proceedings subsequently filed a Plan of Reorganization that was adopted by the Bankruptcy Court, but plaintiffs filed an objection to that plan on November 30, 2009.[79]   The plan was confirmed over plaintiffs' objections.[80]   As part of the company's discharge from bankruptcy, Pilgrim's Pride is excluded from liability in this case.[81]   However, the Bankruptcy Court issued an order on January 14, 2010, clarifying that suits against third-parties, like the individual employee defendants in this case, could nonetheless proceed.[82] With few exceptions, the parties gave no notice regarding the occurrence or details of most of these proceedings and determinations until March 5, 2010.[83]

After review of these materials, the court once again set defendants' motions to exclude for a hearing, this time on April 27, 2010.[84]   Over the course of more than

---

[77] *See id.*; doc. no. 141, Ex. A, at 2-3 (Order by the Bankruptcy Court Regarding Debtors' Motion to Stay Certain Litigation).

[78] Doc. no. 141, at 2.

[79] *Id.* at 2-3.

[80] *Id.*; doc. no 141, Ex. C (Findings of Fact, Conclusions of Law, and Order of the Bankruptcy Court Confirming Debtors' Amended Joint Plan of Reorganization).

[81] *See* doc. no. 141, at 3; *see also*, doc. no. 141, Ex. C, at 16-17, 27, 30-34; doc. no. 141, Ex. D, at 5-6.

[82] *See* doc. no. 141, at 3; doc. no. 141, Ex. D, at 9-11.

[83] Doc. no. 141, at 2.

[84] Order of April 2, 2010.

eight hours, the court took testimony from both of plaintiffs' experts and heard extensive argument regarding whether those experts, and specifically the reports they have tendered pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), satisfy the requirements of Federal Rule of Evidence 702, as elucidated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

## B.    Professor Borjas's 26(a)(2)(B) Report and Proposed Testimony

Plaintiffs have proffered Dr. George J. Borjas for the purposes of testifying "that wages paid by Pilgrim's Pride to the Plaintiffs were depressed as a result of Defendant's alleged practice of employing legally ineligible workers."[85] *See Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1287 (11th Cir. 2006) (reiterating the elemental requirement that plaintiffs must show that "the injury pled was proximately caused by the claimed RICO violations") (citing *Anza v. Ideal Steel Supply Corp*, 547 U.S. 451, 458-59 (2006)).  Pursuant to the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) and the orders of this court, Dr. Borjas created a report detailing his methodology, the data upon which he relied, and the opinions he derived from the data.

The central premise of much of Dr. Borjas's academic work, and of his analysis in this case, is that, at least in the short run, "[o]ther things equal, an immigration-

---

[85] *See* Borjas Report, ¶ 2.

induced increase in the size of the workforce lowers the wage of competing workers."[86]  This assertion proceeds from foundational economic principles of supply and demand in a competitive market.[87]  Consistent with this theory, Dr. Borjas developed an econometric framework to "estimate[] the responsiveness of wages to immigration-induced supply shifts in a national labor market defined along the dimension of skills . . . ."[88]  Though Dr. Borjas admits that no studies have yet done so, he asserts that "there are no conceptual reasons that prevent the theory and econometric methodology from being adapted to the current context."[89]

To that end, his report proposes to measure this responsiveness of wages to increases in the labor supply resulting from immigration (the "wage elasticity") by use of a regression analysis that will determine the curve-of-best-fit for the relationship of three variables:[90]  (1) the increase in the labor supply as a result of immigration to the area, determined by using the relative increase in the number of

---

[86] *Id.* ¶¶ 5-6.

[87] *Id.* ¶¶ 6-7.

[88] *Id.* ¶ 8; *see also* George J. Borjas, *The Labor Demand Curve* Is *Downward Sloping: Reexamining the Impact of Immigration on the Labor Market*, 118 Q.J. Econ. 1335 (2003) (a copy of which is available in the documents filed with the court as Borjas Deposition, Ex. 5).

[89] Borjas Report, ¶ 8.

[90] *Id.* ¶¶ 32-38; *see* W. Paul Vogt, *Dictionary of Statistics & Methodology* 239-43 (2d ed. 1999) (explaining that regression is a statistical technique to determine the relationship between two or more variables that results in an algebraic equation, often expressed graphically (in this case as a curve), that "best summarizes the relationship between the dependent and independent variables").

students in the Russellville School District as a proxy;[91] (2) the real wage of hourly workers employed at the Russellville Pilgrim's Pride facility; and (3) the number of person-hours employed at the plant.[92]   The slope of this curve will describe the change in wage for every incremental increase in the local labor supply.  To deal with the problem that such a measure "would simply reflect the market pressures . . . in the entire labor market, and would not provide any information about how the Russellville plant's wages respond to a shift in Pilgrim's Pride's own polices towards employment of undocumented workers," he proposes to further demonstrate that the company has "wage discretion," — that is, it has market power to pay a lesser wage than its competitors for the same pool of labor.[93]   With this demonstration of market power, his report indicates he can simply multiply the coefficient of wage-change for every increase in labor supply (determined by the regression) by the number of workers hired in violation of the predicate acts, and thereby determine proximately caused damages.[94]

## II.  LEGAL STANDARDS

---

[91] Borjas Report, ¶ 36.

[92] *Id.* ¶¶ 24, 26-28.

[93] *Id.* ¶¶ 16-21.

[94] *See id.* ¶¶ 39-41; doc. no. 111 (Response to Motion for Summary Judgment), at 49 ("Plaintiffs' damages expert, Prof. George Borjas, has concluded that the hiring of illegal immigrants at the Plant caused Plaintiffs' wages to be depressed.").

## A.    *Daubert* **Motion Standards**

"'Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific [and technical] evidence.'" *United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)) (alteration in original).   "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (internal quotation omitted).

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  At base, the analysis requires "the proponent of the testimony . . . [to] show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which he reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact." *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).  These requirements can be shown by demonstrating that "'(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods

24

reliably to the facts of the case.'" *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (quoting Fed. R. Evid. 702).

"The inquiry . . . is a flexible one" because, in any given case, "[m]any factors will bear on the inquiry, and . . . [there is no] definitive checklist or test." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993).  Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular . . . technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant . . . community.

*Hendrix ex rel. G.P.*, 609 F.3d at 1194[95] (internal quotation marks and alterations omitted).

**B.     Summary Judgment Standards**

---

[95] Additional factors the court may consider include:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

> (2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

> (3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

> (4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee's notes, 2000 amends. (internal citations omitted).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion" and "all reasonable doubts about the facts [are] resolved in favor of the non-movant." See *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir.1999) (internal quotations omitted).

Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)). The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; instead, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

### III. DISCUSSION

## A.    Plaintiffs' Rule 56(f) Petition for Further Discovery

Lead counsel for plaintiffs, Howard Foster,[96] executed an affidavit seeking further discovery contemporaneously with plaintiffs' response to defendants' motion for summary judgment.[97]  Oddly, other than two bare citations to the exhibit number of this document in their brief opposing summary judgment, plaintiffs did not expressly advert to what effectively amounts to a Rule 56(f) affidavit in any filing, nor did plaintiffs ever file a standalone motion seeking further discovery in conjunction with it.[98]  At the *Daubert* hearing, defendants argued plaintiffs had failed to timely move, under Rule 56(f), for further discovery, and plaintiffs did not dispute that assertion.[99]  Plaintiffs did, however, stringently argue that, to the extent doing so was necessary, Dr. Borjas would be able to "complete his report" and cure any

---

[96] While this court never entered an order denominating Foster lead attorney, plaintiffs' complaint seeks his designation as such, and he named himself as such before this court.  *See* doc. no. 49 (Second Amended Complaint), ¶ 80; *Daubert* Hearing Transcript, at 4.

[97] Doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit).

[98] Doc. no. 111 (Response to Motion for Summary Judgment), at 1, 58.  There are two additional references to plaintiffs' Second Rule 56(f) petition, which was filed in conjunction with their opposition to defendants' preliminary motion to exclude Borjas's testimony and for summary judgment.  *Id.* (citing doc. no. 111, Ex. A (originally filed on Aug. 13, 2008, as doc. no. 91, Ex. H)).  While the affidavit is titled "in support of Plaintiffs' Fed. R. Civ. P. 56(f) response to Defendants' Motion for Summary Judgment," the court has tried in vain to discover some "response" other than the brief citations to the affidavit.  Plaintiffs' near silence regarding their petition for further discovery is all the more bewildering given that plaintiffs are clearly aware of the procedure and arguments that usually underpin such a request.  *See* doc. no. 25, *passim* (providing seven pages of detailed argument as to why plaintiffs' First Rule 56(f) petition, filed June 20, 2007, should be granted).

[99] *See Daubert* Hearing Transcript, at 279.

deficiencies in it as proof of causation and damages if they were permitted further discovery.[100]   The court will address this assertion on the presumption that a Rule 56(f) petition was properly made.   *Cf. Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 844 (11th Cir. 1989) ("We reaffirm that rule 56(f) is 'infused with a spirit of liberality,' [though] we cannot go so far as to *require* courts to make such a motion on behalf of a party that deliberately chooses not to do so itself.") (quoting *Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 527 (11th Cir. 1983)) (emphasis supplied).   Further, since the additional discovery sought would be directed exclusively to permitting Dr. Borjas to amend his report, it must be dealt with before the court will examine whether Dr. Borjas's proposed testimony is sufficiently reliable evidence on these two elements of plaintiffs' *prima facie* case.

Plaintiffs identify two related categories of data about the employment levels at the Russellville facility that would allegedly enable Dr. Borjas to complete his report.   First, they seek "to resolve the dispute and/or verify" data about the total number of employees at the facility, including temporary workers, calculated in terms of man-hours, for the previous decade, as well as the wages paid all unskilled workers

---

[100] *Daubert* Hearing Transcript, at 283-85, 294-96; *see also* doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit), ¶¶ 6-7 ("Plaintiffs need additional discovery to fully explore the issue of [the impact of process automation at Pilgrim's Pride on employment levels at the Russellville facility] and to enable us to estimate the damages to the Plaintiffs.").

for the same period.[101]  As a closely related corollary, they seek information about any capital improvements at the plant, so that Dr. Borjas may properly account for the effects of process automation on employment levels.[102]

To demonstrate an entitlement to further discovery under Rule 56(f), a party must "set[] forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment." *Harbert International, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998).  Plaintiffs' affidavit provides sufficient detail about the facts they seek to discover and, albeit inferentially, how those facts would create a genuine issue.[103] Particularly where the parties have already been afforded significant discovery, however, such a showing is not, by itself, sufficient.  *E.g.*, *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 270, 298-99 (1968) (approving of denial of Rule 56(f) motion where failure to produce necessary evidence, "despite considerable discovery, demonstrated that additional discovery would be merely a fishing expedition and would unduly harass" the other party).  The Eleventh Circuit has made abundantly clear that a party will not be entitled to further discovery under Rule 56(f) where the absence of evidence crucial to its case is the result of that party's

---

[101] Doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit), ¶ 7.

[102] *Id.* ¶¶ 4-5.

[103] *Id.*

lack of diligently pursuing that evidence through the discovery it was permitted.  *E.g.*,

*Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir.

1990) (affirming denial of 56(f) petition where "[t]he parties [had] agreed on a

discovery schedule which the trial court extended on several occasions").   "Because

the burden on a party resisting summary judgment is not a heavy one, one must

conclusively justify his entitlement to the shelter of rule 56(f) by presenting *specific*

*facts explaining the inability to make a substantive response* as required by rule 56(e)

. . . ." *S.E.C. v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980)

(emphasis supplied) (quotation marks and internal citations omitted).[104]   This is

"particularly [so] where, as here, ample time and opportunities for discovery have

already lapsed."  *Id.*  Accordingly, it is necessary not only for a party moving for

further discovery to show precisely *what* it expects to discover if furnished additional

time, but *why* it should be furnished additional time at all.  *See* 10B Charles Alan

Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2741,

at 405-07 & n.15 (2d ed. 1998).

Plaintiffs advance three explanations for their failure to obtain sufficient

information to enable Dr. Borjas to accurately determine and account for changes in

---

[104] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

employment levels at Pilgrim's Pride.  First, they contend that they did not become aware that capital improvements may have affected employment levels at the facility until too late in the discovery period.[105]  Second, they argue that, notwithstanding the enormous amounts of employment data disclosed, the true level of employment at Pilgrim's Pride during the relevant period remains "disputed" and "uncertain[]" because of "defendants' inaccurate discovery responses" and purported failure to disclose the number of temporary workers.[106]  Third, they protest that "the very limited discovery permitted . . . simply did not permit Plaintiffs to depose the Plant personnel necessary to determine the true level of employment there."[107]

Plaintiffs' averment in counsel's affidavit that they did not know about "the possibility that automation decreased the need for hourly employees until the end of the discovery period" is flatly contradicted by the expert whose testimony would be shored up if they were granted the further discovery they seek.[108]  Initially, it is difficult to believe, especially in light of plaintiffs' counsels' extensive experience

---

[105] Doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit), ¶¶ 4-5.

[106] *See generally* doc. no. 111, Ex. A (Plaintiffs' Second Rule 56(f) Affidavit) (incorporated by reference into Plaintiffs' Third Rule 56(f) Affidavit, doc. no. 111, Ex. B, at 2 n.1); doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 4-5 & nn.8, 12-13.

[107] Doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 5; *see also* doc. no. 111 (Response to Motion for Summary Judgment), at 50 ("Further, discovery has been limited in this complex case (*i.e.* five depositions per side).")

[108] Doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit), ¶ 4.

with cases alleging wage depression theories identical to the one at issue here,[109] that

plaintiffs were unaware that their damages theory, which necessarily requires precise

measurement of trends in employment levels, would need to account for automation.

The potential impact of automation on employment levels in the short run has not

_____

[109] Indeed, this court has discovered no fewer than seven cases in which plaintiffs' counsel Foster has been involved, all of which were prosecuted prior to or contemporaneously with the present case, alleging identical legal theories and identical theories of wage depression proximately caused by the hiring of illegal immigrants. *E.g.*, *Williams v. Mohawk*, 465 F.3d 1277 (11th Cir. 2006); *Baker v. IBP, Inc.*, 357 F.3d 685 (7th Cir. 2004) (upholding dismissal for failure to state a claim), *cert denied* 543 U.S. 956; *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002); *Marin v. Evans*, No. CV-06-3090-RHW, 2008 WL 5377915 (E.D. Wash. Dec. 3, 2008); *Brewer v. Salyer*, No. 1:06cv1324 AWI DLB, 2008 WL 905216 (E.D. Cal. Apr. 3, 2008); *Hernandez v. Balakian*, 251 F.R.D. 488 (E.D. Cal. 2008); *Trollinger v. Tyson Foods, Inc.*, 543 F. Supp. 3d 842 (E.D. Tenn. 2008) (granting summary judgment to defendant poultry processor). At least two further suits including Foster as plaintiffs' counsel and alleging identical theories were filed after this action and are currently pending in district courts in this circuit. *See Walters v. McMahen*, No. 1:10-cv-257-MEF-CSC (M.D. Ala. Mar. 22, 2010); *Broussard v. Maples*, No. CV-09-S-1563-N (N.D. Ala. Aug. 4, 2009). Counsel Foster also prosecuted two actions asserting the mirror image theory that a company's hiring of illegal immigrants permitted them to pay workers lower wages, thereby giving them an advantage over competitors that satisfied the RICO proximately-caused-damages element. *Commercial Cleaning Services L.L.C. v. Colin Service Sys. Inc.*, 271 F.2d 374 (2d Cir. 2001); *A.L.L. Masonry Construction Co., Inc. v. Omielan*, No. 07 C 5761, 2009 WL 2214026, at *7-8 (N.D. Ill. Jul. 23, 2009) (granting summary judgment for defendants in action in which "[p]laintiff's theory is essentially that Defendants utilized a workforce of largely unauthorized workers to depress wages . . . ."). There is yet a further case alleging a substantially similar theory and damages due to wage depression under a state law cause of action. *Perez-Farias v. Global Horizons, Inc.*, No. CV-05-3061-MWL, 2006 WL 2129295 (E.D. Wash Jul. 28, 2006). Dr. Borjas provided testimony in at least five of those other cases. *E.g.*, Brief of Plaintiff-Appellants, *Williams v. Mohawk Industries, Inc.*, NO. 08-13446-G, 2008 WL 4735340, at *51-52 (11th Cir. Oct. 6, 2008) ("The district court accepted affidavits from experts, including Professor George Borjas, a leading authority on the impact of illegal immigration, who testified that fundamental economic principles establish that an illegal increase in labor supply negatively impacts wage rates."); Defendants' Motion to Strike Plaintiffs' Expert Reports, at 20-21, *Broussard v. Maples*, No. CV-09-S-1564-NE (N.D. Ala. Aug. 12, 2010); *Marin v. Evans*, No. CV-06-3090-RHW, 2008 WL 4224393, at *4 (E.D. Wash. Sept. 11, 2008); *Brewer v. Salyer*, 2008 WL 906216, at *4-5; *Trollinger v. Tyson Foods, Inc.*, No 4:02-CV–23, 2008 WL 305032, at *8-10 (E.D. Tenn. Jan. 31, 2008) (restricting the use of Dr. Borjas's testimony to the general theory of how immigration can deflate wages); *see also* Borjas Deposition, at 139-40 (Dr. Borjas testifying that he was retained in the *Mohawk*, *Marin*, *Brewer*, and *Trollinger* cases).

only been extensively examined in economic literature since at least the Industrial Revolution, but also is so commonly understood that it has given rise to its own phrase: "labor-saving technology."[110]  Further, plaintiffs' assertion that it "makes no economic sense," and Dr. Borjas's contention that "it is hard to reconcile the reported decline in employment with the fact that there was an increase in the Russellville plant's output," are at best disingenuous when Dr. Borjas's own textbook addresses the precise point:  "If the technological advances that are being introduced constantly into the labor market are good substitutes for unskilled workers . . . this type of technological change would lower the demand for unskilled labor."  George Borjas, *Labor Economics* 306 (4th ed. 2008).  Dr. Borjas also does not dispute that United States Census Bureau statistics showed employment per plant falling by 5 percent in

---

[110] *E.g.*, William J. Baumol & Alan S. Binder, *Economics:  Principles & Policy*, 425-26 (2007) ("In the very short run, an increase in labor productivity (that is, of labor-saving technology) often causes a downward shift in the demand for labor, which holds down wages."); Pierre Cahuc & Andre Sylberberg, *Labor Economics*, 565-66 (2004) ("If innovations make it possible to obtain the same production with less labor, we say they are labor saving . . . .").  Both of these are university-level economics texts.  The proposition that labor-saving technologies may decrease employment levels while increasing productivity is indeed well-established in the economics literature. *E.g.*, Alvin H. Hansen, *Institutional Frictions and Technological Unemployment*, 45 Q.J. of Econ. 684, 684-97 (Aug. 1931); Joseph Alden, *First Principles of Political Economy* 27-30 (1879) ("The immediate effect of the introduction of labor saving machinery is to lessen the demand for labor — to throw laborers out of employment.").  This is a 19th Century text designed for "advanced classes in our public schools . . . ." *Id.* at *preface*.  *See also* doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 3 (illogically, and incorrectly, asserting that "[f]rom an economist's perspective the level of employment at the Plant *rose* during the relevant period through the introduction of labor saving devices which replicate the work of over 200 people, resulting in a large increase in output"). *Cf.* Borjas Deposition, at 297 ("Q.  Clearly if capital improvement had been made you might expect a decrease in employment and an increase in productivity?  A.  Definitely.").

the poultry industry as a whole between 2003 and 2006, while output per employee rose 17 percent and capital investment rose by 17.2 percent.[111]

More importantly, Dr. Borjas testified that he discovered discrepancies between the data he was given on the output of the Pilgrim's Pride plant and the number of employees "the minute [he] started playing with the data."[112]  He immediately "told counsel that there were things in the data that seemed contradictory, and [he] did ask specifically about the capital improvements . . . and . . . told counsel that without resolution of th[o]se issues" he would be unable to perform the regression analysis he had been retained to conduct.[113]  At the *Daubert* hearing, Dr. Borjas reiterated this point:  "And I remember asking counsel at the time, is there anything on the lines of a machine coming in that would explain this?  And the answer provided to me at the time was no, but that answer, I think is incorrect."[114]  Plaintiffs never asked defendants for that information.[115]  Instead, plaintiffs' counsel told Dr. Borjas that "[h]e didn't know of any" capital improvements, and that there "wasn't any data in

---

[111] *See* Borjas Deposition, at 378-79; Welch Declaration, ¶ 22.

[112] Borjas Deposition, at 107.

[113] *E.g.*, *id.* at 105, 118-19 ("I had no information on capital investment one way or the other it seems because there was nothing from the discovery itself except this TVA report as to whether capital investments that they had actually increased over time and *counsel said there was nothing to indicate that they had* . . . .") (emphasis supplied).

[114] *Daubert* Hearing Transcript, at 161-62.

[115] *See id.* at 282 (Plaintiffs' counsel Foster answering the question whether he ever asked for the information Professor Borjas had requested and admitting the following:  "That's true.  We didn't formally ask for it.  That's true.  We didn't formally ask for it.").

the context of the case."[116]  Dr. Borjas conveyed to counsel that, "without resolution of these issues," he would be unable to determine the critical element of wage elasticity:

> Q.    What did counsel say to you about that?
>
> A.    Write what you have.
>
> Q.    Finish your report.
>
> A.    That's what I did.[117]

Plaintiffs admittedly deposed at least two Human Resources professionals at the plant after Dr. Borjas requested information about capital improvements and their possible impact on total man-hours at the facility, and yet they never asked any questions on the point.[118]  Accordingly, this proffered explanation for plaintiffs' failure to obtain information necessary to permit Dr. Borjas to complete his analysis during the time they were afforded does no more than highlight that they failed to do so.

Plaintiffs' second explanation for their failure to obtain sufficient information regarding the number of man-hours — that defendants "sandbagged" them by

---

[116] Borjas Deposition, at 100.  Dr. Borjas's report itself cites a Tennessee Valley Authority report to Congress that *explicitly* stated that the facility, then owned by Gold Kist, Inc., had made capital investments in production equipment.  Borjas Report, ¶ 28.

[117] Borjas Deposition, at 106.

[118] *Id.* at 280-82.

providing inaccurate information[119] — also is unavailing and for similar reasons. Plaintiffs make much of Pilgrim's Pride's conceded overproduction of employment files for individuals employed on April 18, 2008.  Initially, Pilgrim's Pride produced approximately 1,900 employee files.  However, on June 6, 2008, defendants' response to the first question in plaintiffs' second set of interrogatories indicated that, on May 1, 2008, there were 1,344 employees at the facility.[120]   By June 6, 2008, the discrepancy was resolved when defendants acknowledged they had mistakenly sent the files of approximately 600 individuals who were *not* current employees on the relevant date.[121]   Plaintiffs provide no explanation whatsoever why a discovery discrepancy resolved well over a month and a half prior to issuance of Dr. Borjas's report would affect his ability to complete it.  Further, the production discrepancy related to the analysis of plaintiffs' immigration expert, James M. Johnston, who examined the files for the purpose of opining about the probable legality of each

---

[119] *Daubert* Hearing Transcript, at 281-84; doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 4-5.

[120] *See* doc. no. 110, Ex. 5, at 3 (copy of Defendants' Response to Plaintiffs' Second Set of Ineterrogatories); doc. no. 111, Ex. A (Plaintiffs' Second 56(f) Affidavit), ¶¶3-6 (recounting the course of the dispute).

[121] *See* doc. no. 110 (Response to Motion to Exclude the Testimony of James Johnston), at 4 (citing, as the discussions that "revealed" the overproduction, an email dated June 4, 2008 and a letter dated June 6, 2008, included as Exs. 6, 7, respectively, to document 110); doc. no. 105 (Motion to Exclude the Testimony of George Borjas), at 16-18 (detailing the progress of the dispute and its resolution, via teleconference, on June 5, 2008); doc. no. 105, Ex. P, at 1 (email between counsel explaining possible reasons for the "inflated numbers" of employees initially in First Johnston Report).  *See also*, doc. no. 110, Ex. 3 (First Johnston Report), at 1, 4, 13.

individual employee.[122]   Professor Borjas expressly stated that *he had never read* Johnston's report and, even though he cites two numbers from the report, there is no indication any delay in receiving those numbers impacted his analysis.[123]

Plaintiffs also advance the argument that they are entitled to more discovery because their failure to obtain accurate employment data for Dr. Borjas is attributable to defendants' failure to provide them information regarding temporary contract workers at Pilgrim's Pride.[124]   Yet, plaintiffs knew that Pilgrim's Pride had used temporary employee services at least as early as defendants' supplemented responses to plaintiffs' first set of interrogatories, which plaintiffs received on June 17, 2008, more than a month before Dr. Borjas rendered his report, and more than two months prior to the close of discovery.[125]   Still, they apparently chose thereafter to neither refine their interrogatories to determine the numbers of such workers, nor to subpoena the records of the several temporary employment service providers defendant Thomas

---

[122] *See generall*y doc. no. 106, Ex. A (Second Johnston Report), at 1, 5, 14.

[123] Borjas Deposition, at 299 ("Q:  Have you seen the immigration expert's report in this case?  A:  I have not read the report."); Borjas Report, ¶¶ 39-41

[124] Doc. no. 111, Ex. A (Plaintiffs' Second Rule 56(f) Affidavit), ¶ 11-12.

[125] *See* doc. no. 91, Ex. A, at 9.  Plaintiffs deposed defendant and Human Resources Hiring Clerk, Phyllis Thomas, two days after these responses were served.  Doc. no. 105, Ex. 2 (Deposition of Phyllis Thomas) [hereinafter Thomas Deposition] at 1, 25.  Plaintiffs asked questions about the number of contract employees hired.  *Id.* at 169-71.  Thus, their assertion that they need further information regarding contract employees is, in reality, mere dissatisfaction with the numbers defendants provided in sworn discovery.

identified as having provided contract labor to Pilgrim's Pride.[126]  Rather, they simply relied on conflicting responses from witnesses to assert that the number of such workers is "disputed," and that they should, therefore, be entitled to further discovery. Plaintiffs' apparent contention that defendants should have turned over the information *without their requesting it* lacks merit entirely.[127]  Certainly plaintiffs cannot contend that their failure to properly pursue evidence that they knew existed two months prior to the close of discovery "conclusively justif[ies their] entitlement to the shelter of rule 56(f) by . . . specific facts explaining the[ir] inability to make a substantive response . . . ." *Spence & Green Chem. Co.*, 612 F.2d at 901.

Plaintiffs also assert that their failure to obtain correct employment level data was the result of inconsistencies between the numbers of employees stated in defendants' interrogatory responses and in other documents plaintiffs have uncovered.[128]  Specifically, plaintiffs identify two sources of information that appear

---

[126] Thomas Deposition, at 165-70.

[127] *See Daubert* Hearing Transcript, at 261 (Plaintiffs' Counsel Foster:  "We found out there were temporary workers who came in at night who *worked for another firm*.  We found out there were a lot of all kinds of [*sic*] contradictions in what we were able to obtain.") (emphasis supplied). Plaintiffs' interrogatories asked *only* for the "total number of hourly employees," a term that would not naturally include contract laborers employed by a separate entity.  Doc. no. 110, Ex. 5 (Defendants' Responses to Plaintiffs' Second Set of Interrogatories), at 3.  Plaintiffs make the bare assertion that they "asked Defendants to disclose the number of these workers," but, other than citing to Ms. Thomas's deposition, point to no indication this actually occurred.  Doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 5.

[128] Doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 4.

to conflict with defendants' responses.   The first is a generally addressed memorandum from former Division Manager Don Wisdom discussing the plant's water needs that indicated there were 2,100 employees at the facility in 2005 (which included employees at a nearby hatchery and feed mill that are *not* implicated by the claims in this action),[129] portions of which plaintiffs discovered on a now-defunct website.[130]   The second is a 2004 Tennessee Valley Authority report indicating that the work force would increase to 1,900 at some unspecified point in the future.[131]   Yet again, however, the problem to which plaintiffs point merely highlights their failure to take advantage of the discovery afforded them.[132]   Even assuming these two single-page, outside sources are sufficiently reliable to create a reasonable dispute with defendants' sworn answers to interrogatories, plaintiffs provide no explanation as to why they did not bring the asserted discrepancies to the court's attention *when discovered*, rather than providing an incomplete report months later and then pointing

---

[129] Doc. no. 105, Ex. L, at 1; *cf. Daubert* Hearing Transcript, at 282-83; doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 5 n.13.

[130] Doc. no. 105, Ex. L, at 2 (printout from the website); Borjas Report, ¶ 15 n.25 (citation to the website).   It is notable that the webpage appears to have used the number in 2008, despite the fact that the memo was nearly three years old at that point and, consequently, undoubtedly unreliable regarding current employment figures.   *Cf.* doc. no. 105, Ex. L.   There is nothing to indicate Dr. Borjas ever saw the Wisdom memo itself.   Instead, his report seems to indicate he simply relied upon outdated information from the website of an entity that appears to have since gone defunct.

[131] Borjas Report, ¶ 28 (quoting Tennessee Valley Authority, *Third Quarter Operational Report to Congress* 6 (2004)).

[132] *See, e.g.*, *Daubert* Hearing Transcript, at 165-67 (Dr. Borjas:  "And that's when I contacted counsel, given all the contradicting information.").

to the different numbers as an excuse.[133]   A party who reasonably believes its counterparty is prevaricating or falsifying discovery responses should "promptly [seek] the district court's assistance," and failure to do so should result in "den[ial of a] Rule 56(f) motion . . . on the ground that [the moving party] ha[s] not been diligent." *Exigent Technology, Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1310 (Fed. Cir. 2006) (applying Eleventh Circuit law).   Indeed, the far more likely explanation for plaintiffs' ascription of fault to the numbers defendants provided in their discovery responses is that, when Dr. Borjas applied his theory to those numbers, his theory, as he admitted, "simply didn't hold up in this case."[134] Neither the failure of discovery to prove what a party hoped it would, nor its possible inconsistency with one piece of online hearsay and one speculative third-party public record, are even marginally convincing justifications under Rule 56(f).

Finally, plaintiffs make much of the fact that discovery was "limited in this case," implying that, to the extent they failed to obtain sufficient information to

---

[133] The website containing portions of the Wisdom Memorandum is listed in Dr. Borjas's report as having last been visited on April 10, 2008, more than four months before Dr. Borjas issued his report.  Borjas Report, ¶ 15 n.25; *id.* at 18.  The TVA report is dated June, 2004.  Tennessee Valley Authority, *Third Quarter Operational Report to Congress* (2004).  It is also notable that the list of "Franklin County's Top 10 Employers," a document whose provenance is far from clear, but which Dr. Borjas apparently considered sufficiently reliable to use as the basis for choosing comparator firms, indicates Pilgrim's Pride had 1500 employees.  Doc. no. 105, Ex. H.  This number, consistent with those provided in defendants' interrogatory responses, however, appears not to have been considered reliable, even though the document as a whole was.

[134] Borjas Deposition, at 115-19.

permit Dr. Borjas to complete his analysis, *this court*, as opposed to their attorney, is to blame.[135]  Yet, with a single exception, the amount of discovery permitted plaintiffs to establish their *prima facie* case was precisely what plaintiffs asked for in the parties' Rule 26(f) report.[136]  Still, plaintiffs rail that the five depositions this court allowed in its initial scheduling order were insufficient to permit them to discover the information they needed.  Yet plaintiffs never, as counsel admitted at the *Daubert* hearing, moved for leave to conduct additional depositions and, indeed, despite counsel's suggestion to the contrary, never moved for more discovery at all.[137]

---

[135] *See, e.g.*, doc. no. 111 (Response to Motion for Summary Judgment), at 50 ("Further discovery has been limited in this complex case (*i.e.* five depositions per side)."); Response to Motion to Exclude the Testimony of George Borjas, at 9 n.13 ("Plaintiffs cannot be expected to resolve all fact questions with limited discovery."); *Daubert* Hearing Transcript, at 259-60 (Plaintiffs' Counsel Foster:  "Your Honor, as the Court is aware, the schedule for discovery in this case was very limited. . . . . Five depositions, a limited number of interrogatories back in 2008. . . . It turned out that we didn't get all the data we needed from the discovery that was issued and that explains the incompleteness [and] Professor Borjas's inability to complete his analysis.").  It is notable that the number of interrogatories was not, as counsel stated, limited.  *See* doc. no. 46, at 5.  Further, notwithstanding counsel's repeated indications during the *Daubert* hearing to the contrary, *e.g.*, *Daubert* Hearing Transcript, at 260-61, 274-75, 281-82, the parties' joint stipulation restricting the time frame examined to a single year related *only* to plaintiffs' immigration expert James Johnston.  Doc. no. 72, at 1 (stating that the parties "stipulate . . . that none of them shall dispute that the *data sample considered by Plaintiffs' immigration expert . . . is a representative sample of the* population of hourly employees working at the plant during the applicable limitations period").  Professor Borjas's reliance upon Plaintiffs' immigration expert's report is slight at best.  Borjas Deposition, at 299.

[136] *Compare* doc. no. 43, at 7-9, *with* doc. no. 46 (First Revised Scheduling Order), at 5.

[137] *See Daubert* Hearing Transcript, at 277-79 ("It's my recollection, Your Honor, that's my recollection, that we were limited — we didn't file a motion, but we had for the leave to conduct additional interrogatories, because even if we had, my understanding was — is that we needed to take at least two 30(b)(6) depositions to confirm for Professor Borjas what he needed to know about technical of — the labor saving devices and the temporary workers. He couldn't get a complete picture of it — this was my understanding of it — by issuing one more interrogatory. And we

Instead, they waged desultory and pointless battles to modify the protective order to which they had agreed.[138]  Plaintiffs had self-evidently convincing reasons to permit them to conduct more depositions than allowed in the revised scheduling order:  the discovery of new information (regarding  possible capital improvements and the use of contract labor) and conflicting data regarding employment levels.  They simply chose not to ask.[139]

It is far too late in the day for plaintiffs' plea for further discovery.  Even had the parties not absented themselves for a year and a half of wrangling in a Texas Bankruptcy Court, it would still have been too late.  Plaintiffs were afforded every opportunity to gain the information necessary to prove their case.  The court extended discovery deadlines four times,[140] twice extending the deadline for Dr. Borjas's report

---

couldn't take any more depositions. We had been granted five, and we used the five."). Plaintiffs' counsel is mistaken; plaintiffs did not file a motion for leave to conduct further interrogatories.

[138] *Compare* docs. no. 75, 77, 78, 79, 84 (ultimately denying plaintiffs' request for modification of the protective order to which they had agreed (knowing well that a subpoena to the Department of Homeland Security would be fruitless without information that stipulated order would preclude them from using) to permit them to use several hundred non-party social security numbers in a proposed subpoena), *with* Order of January 11, 2008, *Trollinger v. Tyson Foods, Inc.*, No. 1:08-mc-341-RJL (D.D.C.) (denying enforcement of identical subpoena to DHS filed by plaintiffs' counsel (under a team led by plaintiffs' counsel here) in an identical case just months prior). *See also* docs. no. 92, 96, & 97 (culminating in denial of plaintiffs' motion to unseal *all* documents sealed by defendants pursuant to the stipulated protective order solely on the basis of the purported misdesignation of the deposition transcript of defendant Phyllis Thomas, a document to which plaintiffs undoubtedly had ready access since they noticed the deposition).

[139] The court's first Revised Scheduling Order (doc. no. 46), at 5, expressly provided that the number of depositions permitted during the discovery period was modifiable "for good cause shown."

[140] Docs. no. 46, 60, 70, 85.

42

*after* it was due,[141] and ultimately providing "even more liberal deadlines" than plaintiffs requested.[142] Not once did plaintiffs alert this court to any of the problems they now contend should entitle them to further discovery, nor did they ever seek aid in securing the information Dr. Borjas says was necessary for completion of his report.[143]

Accordingly, plaintiffs' Rule 56(f) petition is due to be denied. Plaintiffs are not entitled to yet another opportunity to tender a Rule 26(a)(2)(B) expert report on damages and causation sufficient to preclude summary judgment. The federal rules do not reward the dilatory, and plaintiffs' lack of diligence militates in favor of denial.[144] Dr. Borjas's report must stand, if it stands at all, on its own two legs.

---

[141] Docs. no. 69, 85.

[142] Doc. no. 69, at 1.

[143] Plaintiffs' counsel's apparent explanation is that "we didn't want to bring too many motions to compel." *Daubert* Hearing Transcript, at 282. This, of course, is a misleading turn of phrase, in that plaintiffs never brought *any* motions to compel. *See also* Dr. Borjas's Report, ¶¶ 42, 43, 44, 46 ("I fully anticipate being able to precisely estimate wage elasticity, wage depression and damages suffered by Plaintiffs following additional discovery that addresses the above mentioned shortcomings in the data.").

[144] While by no means determinative, the court is even more convinced of the correctness of its conclusions by the frustration at constant delay other courts handling identical cases brought by plaintiffs' counsel, based upon very similar theories, have endured, and these courts' consequent refusals to permit still further extensions. *E.g.*, *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 WL 3231793, at *1-2 & n.3 (E.D. TN, Oct. 30, 2007) (denying a motion, filed by a team of attorneys led by plaintiffs' counsel Foster, to once again continue the *Daubert* hearing and vacate the *Daubert* briefing schedule, and expressing throughout frustration with the plaintiffs' "attempt to delay the litigation generally" and failure to timely notify the court of issues that arose despite "ample opportunity" to do so); *Marin v. Evans*, No. CV-06-3090-RHW, 2008 WL 5377915, at *1-2 (E.D. Wash. Dec. 23, 2008) (noting that plaintiffs had continually moved to extend deadlines to permit Dr. Borjas to complete his analysis and granting summary judgment because "while the Rule

**B.     Defendants' Motion to Exclude the Testimony of Dr. George Borjas**

**1.     Dr. Borjas's report is fatally incomplete**

Without more, Dr. Borjas's report fails to present any opinion that would help determine a fact in issue.  To prove their RICO claim in this action, plaintiffs must prove damages "by reason of" the predicate violations.  8 U.S.C. § 1964(c).  The object of Dr. Borjas's proposed expert testimony is to satisfy these elements by causally linking a diminution in wages in a relevant labor market to defendants' alleged hiring of unauthorized workers.

Proper performance of a court's gatekeeping role under Federal Rule of Evidence 702 requires not only that a court determine that a qualified expert has reliably applied reliable methods to sufficient data to permit him to provide an opinion, but also that the opinion the witness purports to provide be actually helpful

---

56(f) motion is labeled as such, in reality, it is another attempt to continue discovery . . . ."); *Trollinger*, 2008 WL 1984264, at *1 (denying reconsideration of grant of summary judgment, noting that "most if not all . . . deadlines in this case [were] extended multiple times" and that, nonetheless, plaintiffs had "failed to make any showing they diligently pursued the evidence" necessary to their case ); *Marin*, 2008 WL 4570579, at *2 (Oct. 10, 2008) ("Plaintiffs, however, have known from the start of the case that they would be required to prove causation in order to succeed in this lawsuit.  The fact that they are only now attempting to do so does not justify extending the time to file their expert designations.  Plaintiffs have received numerous extensions, yet failed to timely undertake the necessary discovery to prove their case."); *Marin*, 2008 WL 4224393, at *3-4 (Sept. 11, 2008) (outlining plaintiffs' constant requests to extend deadlines for Dr. Borjas, despite being "*on notice as early as December 5, 2007, that their expert, Dr. Borjas, needed [certain information] in order to render his opinion and [yet] Plaintiffs did not attempt to obtain this necessary information with due diligence.*") (emphasis supplied).  It is notable that these remarkably familiar frustrations were endured by courts during the exact same period this court endured them.

to determination of a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 591-592 (1993) ("Rule 702's 'helpfulness' standard requires a valid .
. . connection to the pertinent inquiry as a precondition to admissibility."); *United
States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*) ("The burden of
establishing . . . helpfulness rests on the proponent of the expert opinion."); Fed. R.
Evid. 702 (requiring that expert testimony "assist the trier of fact"). Expert testimony
"does not assist the trier of fact unless the testimony has a justified . . . relationship
to the pertinent facts." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)
(citing *Daubert*, 509 U.S. at 591). This requirement stems from basic principles of
relevancy: "expert testimony must be 'relevant to the task at hand[:] . . . it [must]
logically advance[] a material aspect' of the case." *Id.* at 1298-99 (quoting *Daubert*,
509 U.S. at 591). Courts have fleshed out the concept to clarify that, simply because
an expert's conclusion may superficially appear relevant to and helpful in the
determination of facts at issue, if it is too far divorced from the underlying data, it
may ultimately prove unhelpful.

> [T]he Supreme Court has noted that, in the context of this analysis,
> "conclusions and methodology are not entirely distinct from one
> another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
> Although experts "commonly extrapolate from existing data . . . nothing
> in either *Daubert* or the Federal Rules of Evidence requires a district
> court to admit opinion evidence that is connected to existing data only
> by the *ipse dixit* of the expert." *Id.* Rather, the trial court is free to

45

'conclude that there is simply too great an analytical gap between the data and the opinion proffered.' *Id.*

*Hendrix ex rel. G.P. v. Evenflo Co., Inc*., 609 F.3d 1183, 1194 (11th Cir. 2010); *see also, e.g.*, *McDowell* , 392 F.3d at 1301-02 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions . . . .").  If an expert's facially relevant conclusion relates to the data it purports to rely upon only by his own *ipse dixit*, it ultimately is simply an argument, "offer[ing] nothing more than what lawyers for the parties can argue in closing arguments" and, consequently, fails to meet Rule 702's helpfulness requirement. *Frazier*, 387 F.3d at 1262.

As plaintiffs note in their response to the motion to exclude Dr. Borjas's testimony,

> his opinions about causation and damages depend on [a] three part scenario:
>
> 1.  There was an immigration induced increase in the number of potential workers in the local area servicing the Russellville plant.
>
> 2.  There was a decline in the real wage of hourly workers employed at the Russellville plant; and
>
> 3.  There was an increase in the number of persons (or, more precisely, person-hours) employed at the Russellville plant.[145]

---

[145] Doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 9; Borjas Report, ¶ 24.

Dr. Borjas's analysis, however, does not establish the third element.  Indeed, in his report, Dr. Borjas explicitly admits that "the data provided to me indicate a decline in employment at the Russellville plant during the at-issue period — which would seem to contradict" his theory.[146]  Only by concluding that the information he was provided on employment levels was false and (admittedly erroneously) that no automation occurred,[147] and then substituting the facility's output level as a proxy for its employment level, is Dr. Borjas able to draw any conclusion in his report whatsoever.  In his deposition testimony, he forthrightly admitted as much while examining the analysis of his work in this case done by defendants' expert, and Dr. Borjas's former colleague, Dr. Finis Welch:

> Q.      . . . My question for you is . . . where it says ["T]he report provide[s] no evidence that the alleged employment of illegal immigrants by defendants caused wages at Pilgrim's to decline and it does not quantify damages to Plaintiffs,["] is that accurate?
>
> A.      That's accurate.  When I ran the regression model that I needed to run and given that I had no regression model to run, I couldn't go to the next step —
>
> . . .
>
> Q.      ["]His methodology does not include any procedures to examine whether employment of any individuals that might have been

---

[146] Borjas Report, ¶ 28; Borjas Report, Ex. 3.  Defendants' interrogatory responses indicate a decline in workers at the facility from 1667 in 2003, to 1344 in 2008.  Borjas Report, ¶ 28; doc. no. 110, Ex. 5 (Defendants' Responses to Plaintiffs' Second Set of Interrogatories), at 3.

[147] *Id.* ¶¶ 28, 45; *see also Daubert* Hearing Transcript, at 162.

> illegal immigrants actually caused wages at Pilgrim's to be lower [than] had no illegal immigrants been employed;["] is that accurate? . . . That sentence is accurate?

A.    Correct.[148]

Nonetheless, plaintiffs contend that Dr. Borjas *has* provided a viable opinion.[149] They point to paragraphs 45 and 46 of his report in support of that claim.  Paragraph 45 opines that "the preliminary evidence indicates that unauthorized alien worker-induced supply shifts in Russellville did indeed lead to lower wages for workers employed at the Russellville plant."[150]  Paragraph 46 merely indicates that Dr. Borjas "anticipate[s] being able to" complete his analysis "following additional discovery that addresses the above mentioned shortcomings in the data."[151]

Dr. Borjas's preliminary conclusion regarding wage depression is plainly *ipse dixit*.  In the same paragraph he admits that "it has not yet been possible to estimate the statistical model summarized" in the report.  As detailed above, the only data he has regarding one of the three central premises of his theory — that employment

---

[148] Borjas Deposition, at 355-56.  The internal quotation marks indicate the portion of the transcript quoting Welch Declaration, ¶ 5.

[149] Doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 21-24; doc. no. 111 (Response to Motion for Summary Judgment), at 49, 51-52 ("Prof. Borjas concluded that the Defendants' hiring of illegal aliens caused Plaintiffs' wages to be depressed at the Plant.").

[150] Borjas Report, ¶ 45.

[151] *Id.* ¶ 46.  Even these documents purportedly indicating higher levels of employment do not suggest any *increase* in employment, since they only state supposed numbers of employees at one point in time.

levels at the plant increased[152] — flatly contradict his hypothesis.  Hence, any

conclusion that the hypothesis holds true could only derive from an analytical leap

that disregards either the data in front of him, or the conditions antecedent he sets

forth.  Indeed, the sentence that follows the "opinion" to which plaintiffs point shows

that Dr. Borjas was only able to reach even this preliminary conclusion by

substituting product output for employment level.[153]  Professor Borjas admits that he

has no reason to believe that substitution makes sense:

> A.   If you take the data provided in the interrogatories as the true
> data, the correlation works the wrong way, definitely.  If you take
> the output level in the Gold Kist plant as the true level of —
> proportional to employment, the correlation works the right way.
>
> Q.   Okay.  Do you know which one is accurate?
>
> A:   I do not know.[154]

"*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative,

unreliable expert testimony does not reach the jury.  The trial court must 'make

certain that an expert . . . employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field.'"  *Kilpatrick v. Breg,*

*Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Kumho Tire Co., Ltd. v.*

---

[152] *Id.* ¶ 24.

[153] *Id.* ¶ 45.

[154] Borjas Deposition, at 293-94.

*Carmichael*, 526 U.S. 137, 152 (1999)).  Dr. Borjas admitted that, absent inputs he was unable to consider, his analysis "would not be something that one would present."[155]  Further, his expertise is econometrics and applied microeconomics.[156] His analysis was to include an econometric regression to allow him to calculate the degree to which plaintiffs' wages were depressed by Pilgrim's Pride's alleged hiring of illegal immigrants.[157]  That regression analysis, however, was never conducted. Bluntly, Dr. Borjas did not bring his expertise to bear on the relevant factual issues.

Shorn of its purely speculative conclusion, Dr. Borjas's report contains no relevant opinions at all.  Rather, it is merely a recitation of a methodology and facts to which that methodology purportedly could be applied.  "[I]n acting as a gatekeeper, the court is responsible for 'keep[ing] unreliable and irrelevant information from the jury,' because of its 'inability to assist in factual determinations, its potential to create confusion, and its lack of probative value.'"  *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343, 1349-52 (M.D. Ga. 2007) (quoting *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999)).  In its present form, Dr. Borjas analysis fails on all three counts.

Rather than addressing the obvious shortcomings of the report, or providing

---

[155] *Id.* at 104.

[156] Borjas Report, ¶ 1.

[157] *Id.* ¶ 2.

any cogent argument as to why they should not result in the exclusion of Dr. Borjas's testimony from consideration in light of defendants' pending motion for summary judgment, plaintiffs tilt at windmills.  Specifically, they first contend that the law does not require them to prove any *amount* of damages as part of their *prima facie* case, provided they have shown "the fact of damage."[158]  While this statement of the law is highly questionable, *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 466 (2006) (stating that it is "plaintiff's responsibility to prove that the amount of damages he seeks is fairly attributable to the defendant"), this court need not determine whether it is correct, because Dr. Borjas admitted he had not even established that much. When asked whether he had been "able to form an opinion as to whether wages . . . were decreasing or increasing or staying the same with the influx of immigrants into the Russellville facility," Dr. Borjas candidly admitted he "was unable to distinguish among these various possibilities."[159]  He testified that he "ended the report . . . basically by saying, if the output data was actually a correct measurement of employment, in other words proportional to employment, and I had no information on capital investment one way or the other . . . and counsel said there was nothing to indicate they had," then he could conclude causation.[160]  However, "[t]hat is a big

---

[158] Doc. no. 111 (Response to Motion for Summary Judgment), at 50-51
[159] Borjas Deposition, at 117.
[160] *Id.* at 118-19; *see also id.* at 110-12

assumption" that "could be wrong,"[161] and, plaintiffs are ultimately forced to admit, albeit circuitously, that it is.[162]

Moreover, the preliminary conclusion itself only indicates that "unauthorized worker-induced supply shifts *in Russellville* did indeed lead to lower wages . . . at the Russellville plant."[163]  That opinion does not relate *at all* to any unauthorized workers hired by defendants, much less any such hiring that would constitute a RICO predicate act.  It refers only to a possible wage impact of an influx of immigrants into the area.  Such a diminution, even if the speculation it occurred is credited, would not be "damages" to "business or property," since it would be wholly unrelated to "'schemes prohibited by the RICO predicate statutes'" linked to the "relationship . . . between plaintiff workers and their employer . . . ."  *Williams v. Mohawk*, 465 F.3d 1277, 1286–87 (11th Cir. 2006) (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 n.4 (9th Cir. 2002)).  Rather, the opinion refers only to the generalized wage-depressive effect, at least in narrowly defined skill groups, within an aggregated labor market that labor-supply shocks may have, which has been the focus of much of Dr.

---

[161] *Id.* at 119; *see also Daubert* Hearing Transcript, at 162 ("Since then, new evidence has come up . . . and, in fact, tech -- labor-saving technology was introduced into the firm.").

[162] *See* doc. no. 111 (Response to Motion for Summary Judgment), at 51 n.40 ("The preliminary evidence indicates that the Plant did undergo automation, which would explain the decrease in the number of workers . . . ."); doc. no. 111, Ex. B (Plaintiffs' Third Rule 56(f) Affidavit), ¶ 5 (admitting "automation . . . occurred at the Russellville Plant which significantly decreased the need for hourly workers").

[163] Borjas Report, ¶ 45 (emphasis supplied).

Borja's work.  *E.g.*, George J. Borjas, *The Labor Demand Curve* Is *Downward Sloping:  Reexamining the Impact of Immigration on the Labor Market*, 118 Q.J. Econ. 1335, 1335-40, 1369-70 (2003); Abdurrahman Aydemir & George J. Borjas, *Cross-Country Variation in the Impact of International Migration*, 5 J. Eur. Econ. Ass'n. 663, 663-666 (2007) (finding, in a study defining the relevant aggregated labor market as three *countries*, a "numerically sizable and statistically significant inverse relation between labor supply shifts and wages in all three countries").

Second, plaintiffs make a half-hearted attempt to describe this court's ruling on defendants' "Preliminary Motion" to strike Dr. Borjas's report and for summary judgment as "the law of the case."[164]  Plaintiffs are mistaken; law-of-the-case doctrine is manifestly inapplicable.  *See Andujar v. Rodriguez,* 486 F.3d 1199, 1202 (11th Cir. 2007) (denial of summary judgment is an interlocutory, not final, order); *Gregg v. United States Industries, Inc.*, 715 F.2d 1522, 1528 (11th Cir. 1983) ("Ordinarily law of the case applies only where there has been a final judgment and not to interlocutory rulings."); *see*; *see also Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 12 & n.14 (1983) ("[E]very order short of a final decree is subject

---

[164] *Daubert* Hearing Transcript, at 274 ("I regard that issue there, the incompleteness of Professor Borjas's report as being decided[,] that's the law of the case.  The court already ruled on their argument that it needed to be complete."); doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 4 n.9 ("The Court has already denied Defendants' 'Preliminary Motion for Summary Judgment' predicated upon the alleged incompleteness of Prof. Borjas' Report.").

to reopening at the discretion of the district judge.") (1983); *Messinger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.) ("'[L]aw of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."); *Curran v. Kwon*, 153 F.3d 481, 486-88 & n.11 (7th Cir. 1998) ("[T]he denial of summary judgment . . . was not the law of the case and did not bind the court . . . .").

As noted above, defendants' motion was expressly denominated "preliminary" in nature;[165] it was filed more than three weeks prior to both Dr. Borjas's deposition and the close of discovery;[166] and, most importantly, the motion was summarily denied in a three-sentence order.[167]  It should have been blatantly obvious to even the most novice litigator that this order was not intended to foreclose similar arguments when ripely made without wasting judicial resources to hand-hold counsel through the reasoning.  Moreover, even if the doctrine were applicable — and it is not — the significant further factual development that occurred after the ruling on defendants' "preliminary" motion would clearly justify reconsideration.  *See, e.g.*, 18B Wright, Miller, & Cooper, *Federal Practice and Procedure* § 4478.1, at 695 ("A ruling made

---

[165] Doc. no. 87, at 1.

[166] Doc. no. 85, at 2 (setting August 29, 2008 as the deadline for completion of discovery).

[167] Doc. no. 93.

early in the proceedings may rest on poorly developed facts that have been better developed by continuing proceedings.  In these circumstances, the forward progress of the case encourages reconsideration.").

Accordingly, Dr. Borjas's report provides no viable opinion regarding facts in issue.  As such, plaintiffs have failed to carry their burden of demonstrating that his testimony would prove "helpful," and his testimony is, accordingly, due to be excluded and his report stricken.

2. **Even were the conclusions supported, Dr. Borjas methodology is insufficiently reliable as applied to the facts of this case.**

The parties do not dispute that Dr. Borjas is eminently qualified.  His work on the subject of the impacts of immigration on native workers has had a profound impact on the field of study.  Yet, "at all times, the district court must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it." *Kilpatrick*, 613 F.3d at 1336.  "The burden of establishing . . . reliability . . . rests on the proponent of the expert opinion":  in this case, plaintiffs.  *Frazier*, 387 F.3d at 1260; *see also Allison*, 184 F.3d at 1306 (the "burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert").  Three portions of the analysis Dr. Borjas proposes are deeply problematic and, at least together, render his opinion unreliable.  Accordingly, because plaintiffs

have failed to satisfy their burden to prove reliability, even had Dr. Borjas completed the analysis he describes in his report, his testimony would still be due to be excluded.

### a.    Dr. Borjas's instrumental variable proxy is unreliable

As outlined above, one of the three central conditions that should be true in order for Dr. Borjas's theory to produce a plausible conclusion that plaintiffs' wages were depressed by defendants' illegal hiring is that there be an "immigration-induced increase in the number of potential workers in the local area servicing the Russellville plant . . . ."[168]  Dr. Borjas uses "the proxy given by the number of Hispanic students enrolled in the Russellville School District, available from the National Center of Education Statistics," to proxy such an increase.[169]  With Hispanic school enrollment as the instrumental variable or "supply shifter" (the crucial moving part in his analysis),[170] Dr. Borjas's theory posits that "[a]n increase in Hispanic enrollment should indicate an increase in immigration — and should lead to lower wages and

---

[168] Doc. no. 111 (Response to Motion for Summary Judgment), at 9; *see also* Borjas Report, ¶ 45 (stating, as a predicate for determining causation and damages, that there must be an "unauthorized alien worker-induced supply shift[] in Russellville").

[169] Borjas Report, ¶ 29; *Daubert* Hearing Transcript, at 154 ("I am going to try to use to the extent I can, the increase in Hispanic enrollment as a sort of . . . proxy that since I don't have the direct measure of immigration, I am going to use the Hispanic enrollment.  So that the proxy that would allow me to approximate how much immigration was increasing by over the period.").

[170] *Daubert* Hearing Transcript, at 150.

greater employment at the Russellville plant."[171]   His methodology examines the correlation between increases in labor supply and decreases in wages to determine how much (and in what direction) wages change for each increment of increase in labor supply.[172]   Once the responsiveness of wages (wage elasticity) is determined, then Dr. Borjas posits that he can simply take the number of workers illegally employed at the plant, and tally the total damages attributable to those illegal hires based upon that responsiveness.[173]   Hence, for example, if wages fell by a dollar for every hundred new workers in an area, then every individual hire that constituted a RICO predicate violation would result in a penny of damages.

Dr. Borjas admits that use of ethnic-breakdown school enrollment data in a study of this variety would be entirely novel.[174]   In support of this particular use in conjunction with wage elasticity analysis, both Dr. Borjas and plaintiffs argue only that the use of school data is used in economic analysis to proxy for "all kinds of other variables" and, therefore, it cannot undercut the reliability of the analysis.[175] Such a general proposition, however, falls far short of demonstrating its reliability in

---

[171] Borjas Report, ¶ 36.  Contrary to defendants' vehement protests, Dr. Borjas persuasively explained that it is irrelevant whether the students are children of documented or undocumented workers.  Borjas Deposition, at 375.

[172] Borjas Report, ¶ 36; *Daubert* Hearing Transcript, at 148-51.

[173] *See* Borjas Deposition, at 399-400.

[174] *Id.* at 248.

[175] Doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 10-11; Borjas Deposition, at 247.

the present context.  *See Elcock v. Kmart Corp.*, 233 F.3d 734, 748 (3d Cir. 2000)
(rejecting the "novel synthesis of . . . two methodologies," even where "[e]ach
approach, taken in isolation, may very well contain sufficient analytical rigor to be
deemed reliable," because it would permit the expert simply to "offer a subjective
judgment . . . in the guise of a reliable expert opinion"); *see also Rider v. Sandoz
Pharmaceuticals Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("[T]he courtroom is
not the place for scientific guesswork, even of the most inspired sort.  Law lags
science; it does not lead it.") (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319
(7th Cir. 1996)).

Dr. Borjas candidly admitted he had not done any test to determine whether the
use of Hispanic student enrollment proxy as the instrumental variable for a labor-
supply shift is valid, and that, if it is not, "[t]he whole method would fail."[176]  This is
so because, as his report notes, "[i]n a regression analysis of this type it is crucial to
use a valid instrument to identify the wage elasticity."[177]  Yet Dr. Borjas readily
conceded that he does not know whether those two statistics — the number of
workers who are new to the area and the number of children of Hispanic origin — are

---

[176] Borjas Deposition, at 288-91, 303; *see also Daubert* Hearing Transcript, at 171-72 ("[THE COURT].  How do you discount that? . . . .  [DR. BORJAS].  The assumption has to be a proportional relationship between — I mean, it's really the technical assumption and the proportional relationship between the number of Hispanic immigrants coming and the number of Hispanic children ending up in schools.").

[177] Borjas Report, ¶ 38.

in any way correlated.[178]  The method he proposes to test the supposition that they are is wholly circular.  He posits that if the number of workers employed at Pilgrim's Pride and the number of Hispanic students enrolled are positively correlated, *i.e.* both rise simultaneously, and the wage level at Pilgrim's Pride and the number of Hispanic students enrolled are negatively correlated, *i.e.* wages decrease while the number of students increases, then his variable would be valid.  In other words, his novel use of enrollment data as a proxy variable is valid if the equation into which it is input confirms the other two central limbs of his hypothesis — that is, the variable will be valid only if it proves plaintiffs' theory of damages.  However, certainly it is highly plausible that the wages and employment level at a single local firm could change simultaneously with the ethnic makeup of an area school system without any causal sinew linking those movements.[179]  Dr. Borjas fails entirely to explain how any correlation between Hispanic school children enrolled in one of several area schools — children who may or may not be children in a large family, children of low-skill

---

[178] Borjas Deposition, at 287-90 (when asked if he tested whether it was possible that "the same group of people stayed in Russellville, yet the entire enrollment went up because of population increase from the same families that were there," Dr. Borjas admitted that he "did not" and does not "have any data" about it whatsoever; rather, he simply relied upon a handful of news reports indicating that Hispanic immigrants were entering the area).

[179] *Id.* at 287-308 (discussing multiple factors that might cause the numbers to move independently or cause a false positive correlation and admitting he "didn't do" tests to see whether it was even *possible* to separate out the labor-supply effects from those created by other factors).

workers,[180] or even children of workers at Pilgrim's Pride — and the employment level and wage at Pilgrim's Pride would necessarily indicate a causal relationship between local labor-supply shifts and the wages of low-skilled workers, rather than a multitude of other factors that could also influence wages (such as changes in economic climate, demand for labor, changes in the local hiring environment, or strategic corporate decisions).   Dr. Borjas admitted that he would need "to hold everything else constant, and [ensure] there is nothing else that is creating a correlation between Hispanic's [*sic*] enrollment in the schools and the wages in the Russellville plant," but his report only purports to describe the correlation, without controlling for any of these other factors, and dub that correlation causal.[181]   *Cf.* Abdurrahman Aydemir & George J. Borjas, *Attenuation Bias in Measuring the Wage Impact of Immigration* 1-5, 42-44 (Nat'l Bureau of Econ. Research, Working Paper No. 16229, July 2010) ("Measurement error, therefore, has been an important — and previously ignored — contaminant of the empirical results reported in this

---

[180] Dr. Borjas's analysis critically depends on the assumption that any increase in labor supply must stem from workers who are perfect (or very near perfect) substitutes in terms of education and experience for the workers whose wages they purportedly affect.  *See* Borjas, *The Labor Demand Curve* Is *Downward Sloping*, *supra*, at 1254-69 (explaining how groups should be sorted among education and experience to determine "closer substitutability"); George J. Borjas, Jeffrey Grogger, & Gordon H. Hanson, *Imperfect Substitution Between Immigrants and Natives: A Reappraisal* 1-5 (Nat'l Bureau Econ. Research Working Paper No. 13887, March 2008) ("The elasticity of substitution between comparably skilled immigrants and natives is a critical parameter for assessing the wage effects of immigration.").

[181] Borjas Deposition, at 304; *see also Daubert* Hearing Transcript, at 172.

literature.").   This is particularly problematic when the statistics show that *the absolute number of students enrolled changed by only three students over the period*, making the correlation of that data to a "supply shock" highly ambiguous at best.[182]

Given the independent factors that might influence the ethnic makeup of a school district and wages/employment levels at Pilgrim's Pride, any interrelationship between trends in those statistics is highly likely to be spurious and yet, provided they confirm plaintiffs' damages theory, Dr. Borjas, a Harvard economist, would tell a jury that they are causally related.   "[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the . . . court[] must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263.   Especially in light of the political and racial implications of a case of this variety, this court is not prepared to admit as reliable this novel use of Hispanic student enrollment as a proxy for an influx of immigration.

### b.   Dr. Borjas's market power analysis is unreliable

In yet another novel adaptation of his wage depression analysis, Dr. Borjas

---

[182] *See* Borjas Report, Ex. 4A.  The enrollment in the Russellville School District was 2411 students in 1999 and 2414 students in 2006.  *Id.*  It is also curious that Dr. Borjas failed to note, or take account of the fact, that Hispanic enrollment in the surrounding Franklin County school district increased by a significantly smaller percentage.  *See* Borjas Report, Ex. 4B.  Notwithstanding his apparent assumptions to the contrary, Dr. Borjas explains away the relatively steady absolute population by speculating that "[t]here are private schools that families might be sending their kids to as the Hispanic enrollment increased.  Maybe the total kids in that age group might be going pretty rapidly, but it doesn't show up not [*sic*] public school data."  Borjas Deposition, at 295.

attempts to separate out the generalized wage-depressive effect of an immigration-induced labor-supply shock, which would "depress the wages for competing workers in *all* firms," by seeking to establish that Pilgrim's Pride "has some discretion over the wage it pays its workers."[183] Dr. Borjas admits that, without proof that Pilgrim's Pride possesses a species of market power that permits it to pay less than the going wage in the area, "trends in the Russellville plant's wages would simply reflect the market pressures resulting from the additional number of workers in the entire labor market, and would not provide any information about how the Russellville plant's wages respond to a shift in Pilgrim's Pride's own polices towards employment of undocumented workers."[184] In other words, to provide any evidence of wage depression causally related to *any actions at all* taken by defendants, he must determine that there exists "some kind of monopsonistic market power on the part of Pilgrim's Pride."[185]

To make this central determination, however, Dr. Borjas simply compared the starting wages of workers at Pilgrim's Pride against four other firms in the area and determined that Pilgrim's Pride paid a lower wage.[186] He admits that "all [he] can

---

[183] Borjas Report, ¶ 17-21.

[184] *Id.* ¶ 17.

[185] *Daubert* Hearing Transcript, at 160.

[186] Borjas Report, ¶ 19-20. For one of the four years he examined, Dr. Borjas was only able to obtain sufficient information for three comparator firms. *See id.*, Ex. 2b; Borjas Deposition, at

gather from this information" is that Pilgrim's Pride "pays less than these four employers in Franklin County."[187]   Nevertheless, he opines that, "[t]he available data, though limited . . . seem[] consistent with the hypothesis that Pilgrim's Pride has some degree of wage discretion."[188]

Yet, in his deposition, Dr. Borjas testified that there are a "whole bunch of factors" that might influence wage differences, but concedes he does not have the data to exclude those other factors.[189]   Indeed, even though the report itself states that one employer's "relatively higher wages" (which were, on average, $1.88 per hour higher than the mean of the five sets of wages he examined)[190] were part of a deliberate policy by that employer to "attract a particular kind of worker," Dr. Borjas included this wage in his data tabulation apparently without accounting for this

---

202-03.  These firms were those who responded to subpoenas sent based upon a list of the supposed "Top 10 Employers in Franklin County" from a now-defunct webpage, whose accuracy is, at best, questionable.  *See* doc. no. 105, Ex. H; Borjas Deposition, at 200-01; Borjas Report, at 7 n.14; *see also supra* note 133.

[187] Borjas Deposition, at 204-05.

[188] Borjas Report, ¶ 20; *see also Daubert* Hearing Transcript, at 247-55 ("Q. So from looking at four other firms you concluded that Pilgrim's Pride had some kind of market power because it paid less than the four other firms?  A.  I concluded the evidence was consistent with the fact that it was some kind of discretion, yes.  Q.  But you don't know how much discretion that is?  A.  I do not know that.  Q. How would you figure that out?  A.  I did not do the analysis.").

[189] *See, e.g.*, Borjas Deposition, at 160-75, 179-81, 207-12, 281-86; 384-93.

[190] The court arrived at this figure independently by averaging the real hourly starting wage figures in Borjas Report, Ex. 2B, taking the difference between that average and the wage of Tiffin Motor Homes, the company from whom Dr. Borjas received that information, and averaging those differences.

"potential limitation" at all.[191]

> Q. Are you aware of any studies, peer reviewed studies, in which a comparison is made with only one, two, or four other firms in which there is a conclusion made that the entity that is paying less is in fact . . . not a price taker or has discretion?
>
> A. I am not aware, because I don't really know the literature up to date in that.  I don't know.  That is the answer.
>
> Q. I think you told us earlier about some of the factors that went into whether or not an entity is a non[-]price taker or one that has discretion over wages, right?
>
> A. Theoretically.
>
> Q. All right.  You did none of that analysis?
>
> A. No.[192]

This is patently insufficient to reliably indicate market power over wages and "fails to meet the criteria of professional soundness and validity that are at the core of *Daubert*'s reliability requirement." *Bailey v. Allgas, Inc.*, 146 F. Supp. 2d 1222, 1236 (N.D. Ala. 2000) (excluding economic expert's market power analysis because he failed to provide any sound economic basis for his definition of the relevant market, failed to rely upon data sufficient to support his opinion, and failed to define the market share controlled by the defendant), *aff'd*, 284 F.3d 1237 (11th Cir. 2002).

---

[191] Borjas Report, ¶ 21.

[192] Borjas Deposition, at 210-11; *see also Daubert* Hearing Transcript, at 246-55.

Dr. Borjas's own academic writing has emphasized the existence of inter-industry wage differentials within the manufacturing sector, and posits multiple reasons why these differentials exist.  *See* George J. Borjas, *Labor Economics*, *supra*, at 478-80. Dr. Borjas admits he did not control for these.[193]  An expert's failure to address alternative explanations for the opinions he asserts in the ways standard in his field of expertise "violates a primary purpose of *Daubert*:  to ensure the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Guinn v. AstraZeneca Pharmaceuticals LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Further, figures compiled by the United States Department of Labor's National Bureau of Labor Statistics indicate that the average weekly income of a worker in a poultry processing facility is less than half that of the average worker in the manufacturing sector as a whole.[194]  The four comparator firms Dr. Borjas used to conclude Pilgrim's Pride had wage discretion were three manufacturing firms and a construction firm.[195]  Dr. Borjas is undoubtedly correct that the national statistics are

---

[193] Borjas Deposition at 364-65.

[194] *See* Borjas Deposition, Ex. 3 (printouts from the Bureau of Labor Statistics website); *see also* Borjas Deposition, at 180-85.

[195] *E.g.*, *id.* at 188-89.

unadjusted for regional differences.[196]  Yet he fails entirely to explain why he did not

even attempt to account *at all* for industry-wide competitive pressures or the wage

differentials that "are probably" present.[197]  Further, among the only two studies of

the firm-specific wage impacts of immigration (neither of which are peer-reviewed

and both of which used much, much larger data sets), the most recent indicates that

inter-industry differences in labor supply elasticity can vastly change, and even

eliminate, any wage differentials attributable to employment of undocumented

workers.  Julie L. Hotchkiss & Myriam Quispe-Agnoli, *Employer Monopsony Power*

*in the Labor Market for Undocumented Workers* 27-28 (Fed. Reserve Bank of Atl.,

Working Paper No. 2009-14c, Dec. 2009).[198]  Dr. Borjas's opinion that Pilgrim's

Pride exercised monopsonistic market power over wages is all the more suspect in

view of the fact that, by his own figures, the wage trends at Pilgrim's Pride mirror

almost precisely the wage trends averaged across the four firms he examined — with

---

[196] *Id.* at 187.

[197] *See id.* at 189; *Daubert* Hearing Transcript, at 241-44.

[198] It is also notable that this study found that "newly arriving undocumented workers appear to have *no impact* on displacing documented workers," at least at the firm level.  Hotchkiss & Quispe-Agnoli, *Employer Monopsony*, *supra*, at 25. The study also found ambiguous the causal link between employing undocumented workers and paying lower wages, since "this could reflect the ability of documented workers to chase the higher-paying jobs at firms not hiring undocumented workers."  The other study, Nikolaj Malchow-Möller, *et al.*, *Do Immigrants Affect Firm-Specific Wages* 23 (Copenhagen Bus. Sch. Working Paper 7-2008, 2008), explicitly cited Dr. Borjas's 2003 study in suggesting that the causal mechanism for the wage effects of immigrant-hiring at the firm level were *different* from what he identified.  There are two other Federal Reserve Bank of Atlanta Working Papers by the same authors that also examine different aspects of the effects of firms employing undocumented workers, though these do not directly address firm-specific wage effects.

Pilgrim's Pride's hourly wages increasing, on average, 3.2% annually, and wages at the four firms he examined increasing only, on average, 3.3% annually.[199]

On several occasions, the Eleventh Circuit addressed the thorough analysis required of experts who seek to demonstrate that an entity possesses market power sufficient to permit it to control the prices of its products independent of market forces. *See, e.g.*, *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 479 F.3d 1310, 1313 (11th Cir. 2007) (upholding rejection of "expert testimony" opining that an entity had market power that "was conclusory, based upon insufficient economic analysis, and incomplete in its definition of the relevant market"); *Bailey*, 284 F.3d at 1247-56 (requiring, among other things, careful definition of the "geographic market" or the "area of effective competition . . . in which the [entity] operates"; determination of "percentage share of that market"; and a demonstration of independent ability to sustain "supracompetitive prices"); *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1553 (11th Cir. 1996) (rejecting expert testimony purporting to demonstrate market power where, as here, the expert failed to account for the ability of individuals to change their affiliation with the relevant entity). Plaintiffs' argument fails entirely to convince the court that Dr. Borjas's "market power" assertion should not be subject to a similarly careful analysis of its

---

[199] *See* Borjas Deposition, at 360-61.

reliability.[200]

### c.    Dr. Borjas fails to adequately account for possible alternative causes

Contrary to plaintiffs' assertion, Dr. Borjas's theory regarding the wage-impacts of immigration on native workers, and the results he has derived from its application, even when examining a national labor market, are not "universally accepted," as Dr. Borjas's own academic work itself recognizes, and, as even a cursory review of the academic literature can attest.  *E.g.*, Aydemir & Borjas, *Attenuation Bias in Measuring the Wage Impact of Immigration*, *supra*, at 3 ("A number of papers have replicated the national-level approach, with mixed results."); Gianmarco I. P. Ottaviano & Giovanni Peri, *Rethinking the Effects of Immigration on Wages* 1-5 (Nat'l Bureau of Econ. Research, Working Paper No. 12497, Aug. 2006) (finding revision of Dr. Borjas's methodology necessary, and producing significantly different results, because, in its present form, the approach only describes the "partial" effect of immigration on wages (since it omits all cross-interactions with other types of workers and flows of labor and capital) and, as such, is "uninformative on the overall effect of immigrants on wages"); David Card, *Is the New Immigration Really So Bad? passim* (Nat'l Bureau of Econ. Research, Working Paper No. 12497,

---

[200] *See* doc. no. 109 (Response to Motion to Exclude the Testimony of George Borjas), at 16-21.

Aug. 2005) (contending the influence of numerous factors, including immigrant assimilation, capital and labor flows, changes in demand for low-skill labor, and imperfect substitutability, make it "hard to argue that the evidence [from analysis using Dr. Borjas's methodology] points to a negative impact of immigration unless one starts from that position *a priori*").   The methodology is entirely without precedent at the level of a single firm in a small rural town.

Indeed, Dr. Borjas has, for more than a decade, been among the most stalwart critics of studies of the impacts of immigration on native wages done at geographic levels smaller than whole nations.   He has stated that, because studies done even at the regional level fail to take into account the responsive flows of both capital and labor, as well as immigrants' self-selection of certain areas and certain industries, they are "completely uninformative" and "do not measure the impact of immigration on the native labor market." George Borjas, *Heaven's Door* 73-82 (1997).   Indeed, the very work upon which he draws as the basis for his methodology in this case[201] suggests that even immigrant self-selection alone can lead to "spurious . . . correlation[s] between immigration and wages."   Borjas, *The Labor Demand Curve Is Downward Sloping*, *supra*, at 1338.   Given the easy mobility of both capital and

_____

[201] Borjas Report, ¶¶ 8-9 ("The econometric framework used in my 2003 article, which estimates the responsiveness of wages to immigration-induced supply shifts in a national labor market defined along the dimension of skills, can be adapted to estimate the analogous effect in the present context.").

workers between geographic areas within the United States, he writes in that paper that, because of various "factor flows," "in the end, immigration affect[s] *every* city, not just the ones actually receiving immigrants." *Id.* "[T]he local labor market can adjust in far too many ways to provide a reasonable analogue to the 'closed market' economy that underlies the textbook supply-and-demand framework." *Id.* at 1339. "Because local labor markets adjust to immigration . . . the labor market impact of immigration may be measurable only at the national level." George J. Borjas, *The Impact of Immigration on the Labor Market* 7 (Conf. on Labor & Capital Flows in Eur., Jan. 2006);[202] George J. Borjas, *Increasing the Supply of Labor Through Immigration: Measuring the Impact on Native-born Workers* 2 (Ctr. for Immigration Studies May 2004) (same); *see also* Silvia Helena Barcellos, *The Dynamics of Immigration and Wages* 3 (Rand Labor & Pop. Working Paper No. WR-755, Mar. 2010) ("Borjas (2003) argues that given internal migration, the correct way to define the labor market is in terms of the nation as a whole.").

The methodology Dr. Borjas has outlined for use in this case, however, purports to describe wage impacts at a much narrower level:  a labor market defined as a single firm.[203]   He asserts that he "believe[s] the same basic methods and

---

[202] *Available at* http://www.jvi.org/fileadmin/jvi_files/Warsaw_Conference/Papers_and_Presentations/Borjas_paper.pdf.

[203] *See* Borjas Report, ¶ 16.

concepts used in the literature can be applied to estimate the impact of immigration at the firm level,"[204] but fails to explain why he has chosen to jettison the skepticism about multiple frustrating factors, even at much larger levels of aggregation, that has driven much of his academic work.

No less an authority on the function of economic theory in legal contexts than Judge Frank Easterbrook of the Seventh Circuit has opined about "the difficulty of establishing that unlawful hiring of aliens caused a diminution in . . . wages" in a case alleging the same theory as that asserted here:

> RICO provides treble damages for direct injuries but not remote ones. . . . Although the Ninth Circuit concluded in *Mendoza* that the injury workers suffer when wages are depressed by competition from aliens is similar to the kind of injuries redressed under the antitrust laws, things may not be so straightforward. An increased supply of labor logically affects, not just the wages at [defendants' Russellville] plant, but wages throughout the region (if not the country). Workers can change employers (leaving [Pilgrim's Pride] for higher pay elsewhere), and this process should cause equilibration throughout the labor market. Yet plaintiffs' theory is not that too many aliens depress wages around [Russellville]; it is that [Pilgrim's Pride] pays lower wages than some competitors, and that effect would be very hard to attribute to particular violations of 8 U.S.C. § 1324(a)(3)(A).

*Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004), *cert. denied*, 543 U.S. 956.

The Supreme Court has admonished courts to be vigilant in application of RICO's requirement that plaintiffs prove damage "by reason of" the substantive

---

[204] *Id.*

RICO violations. "[U]nder civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of New York*, — U.S. —, 130 S. Ct. 983, 989 (2010) (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992)). "[T]he focus is on the directness of the relationship between the conduct and the harm." *Id.* at 991. Plaintiffs must demonstrate "'a direct causal connection' between the predicate offense and the alleged harm." *Id.* (quoting *Anza v. Ideal Steel Supply Corp*, 547 U.S. 451, 460-61 (2006)). There must be "no independent factors that account for [the] injury . . . ." *Bridge v. Phoneix Bond & Indemnity Co.*, 553 U.S. 639, 658 (2008). Even if causing the "harm" asserted was the purpose of a criminal scheme, and acts in furtherance of that scheme have caused it, unless a designated "predicate act directly caused" that harm, then RICO's proximate causation requirement has not been met. *Anza*, 547 U.S. at 460 (stating that a party may not "circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to" cause the harm alleged); *Beck v. Prupis*, 529 U.S. 494, 500-01 (2000) ("[I]njury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO," even if "in furtherance of a conspiracy," "is not sufficient to give rise to a cause of action under § 1964(c)").

There are multiple causal concerns with Dr. Borjas's proposed analysis that

would make it both unpersuasive and highly confusing on this critical causal element.

Plaintiffs' asserted injury is directly caused by the decision, at some level in the

Pilgrim's Pride hierarchy, to set wages below what they hypothetically might

otherwise have been.  Initially, incremental wage-setting decisions in a nationwide

corporation do not follow the smooth curve that Dr. Borjas's measurements require

and may emerge from multiple levels of the corporate hierarchy, many of which may

have no relationship whatsoever to defendants or their alleged co-conspirators.

Further, any wage-setting decision would undoubtedly be influenced by a variety of

factors, many of which Dr. Borjas has written about extensively in cataloguing the

difficulty labor economists have faced in working out the wage impacts of

immigration.  *E.g.*, Borjas, *The Labor Demand Curve* Is *Downward Sloping*, *supra*,

at 1370 (suggesting, as a necessary avenue for further research, "documenting the

many adjustments that take place, by workers and firms, both inside and outside the

labor market, as immigration alters economic opportunities in many sectors of the

economy").  Dr. Borjas's analysis does not even purport to directly examine those

decisions or factors other than illegal hiring that may have influenced them, and to

what degree.  As detailed above, Pilgrim's Pride itself was sliding toward (and

ultimately into) bankruptcy during the relevant time frame, a factor that very probably

impacted the wages it paid over the period examined.  Moreover, it is undisputed that

73

there were significant capital improvements at the company, which Dr. Borjas has written affect *demand* for labor, necessarily altering the supply-and-demand curve his model relies upon. *See* Borjas, *Labor Economics*, *supra*, at 304-09. Further, he does not dispute that the nationwide average wage in the poultry industry on the whole failed to keep pace with inflation during the relevant years — meaning that the real wage in the entire industry nationwide fell (and, hence, that industry-wide competitive pressure pushed al poultry-processing firms, Pilgrim's Pride included, to maintain lower labor costs), a point Dr. Borjas dismisses only by saying that Pilgrim's Pride "might have kept [pace] even less."[205]   A court must ensure an "expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010). Dr. Borjas's failure to account for the very frustrating causal factors he has identified in his academic work is far too problematic.

Moreover, provided *someone* had hired them, Dr. Borjas's general theory itself would posit that, because all unauthorized workers increase the labor supply, wages at Pilgrim's Pride should fall if immigrants had moved into the area, even if Pilgrim's Pride had never hired a single one. *See* Borjas, *The Labor Demand Curve* Is *Downward Sloping*, *supra*, at 1368-70. Thus, the same decline in plaintiffs' real

---

[205] Borjas Deposition, at 377.

wages would occur even if the defendants had not committed the required predicate

act — a fact that entirely eviscerates the assumption that the hiring (much less hiring

with the requisite knowledge) was the "but for" cause of plaintiffs' depressed wages.

Any or all of these factors (and probably several more) could easily explain a

diminution in wages; yet, if Dr. Borjas were to complete his analysis as outlined in

his report, he would control for none of them and would, instead, attribute the entire

diminution in wage to increased labor supply and then multiply that coefficient by the

number of immigrants allegedly hired in violation of the INA.  It is, of course,

decidedly possible that one factor in any diminution may have been a substantive

RICO violation, but Dr. Borjas's analysis does not even purport to show, and

plaintiffs have pointed this court to no other evidence indicating, what portion of the

wage-setting decision is directly attributable to other decisions to hire or harbor

unauthorized aliens.  In short, the showing plaintiffs seek to make could only

demonstrate a correlation between real wages at the Russellville plant and the ethnic

makeup of the local school district — nothing more and nothing less.  Any indication

of the causal link that RICO requires is simply too attenuated.  "A link that is 'too

remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Group, LLC*, —

U.S. —, 130 S. Ct. at 989 (quoting *Holmes*, 503 U.S. at 271, 274) (alterations in

original).  Certainly an expert is not required to "rule out all possible alternative

causes" in order for his testimony regarding causation to be reliable. *Guinn*, 602 F.3d at 1253. However, particularly in light of the Supreme Court's pronouncements regarding RICO's causation element, an expert whose testimony is offered to establish that element "must provide a reasonable explanation as to why he . . . concluded that any alternative cause suggested . . . was not the sole cause of the plaintiff's injury." *Id.* at 1253 (quotation and alterations omitted). This is particularly so where the prospective witness's own academic work suggests those alternatives and has criticized others' work as "uninformative" for failing to properly account for them. The very "objective" of a court's performance of its role as gatekeeper under Rule 702 "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.*, 526 U.S. at 152.

The court holds that plaintiffs have failed to carry their burden of establishing that Dr. Borjas's analysis, as described in his report, could reliably evidence the propositions for which they offer it. To any extent Dr. Borjas's tailored-for-(this increasingly popular strain of)-litigation testimony would be probative on the question of whether defendants' predicate RICO violations were the direct, substantial, but-for cause of plaintiffs' injury, that slight value is far outweighed by

the likelihood his testimony would confuse and mislead a jury. "[C]ourts must take care to weigh the value of such [expert] evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263. The "specific issue" a court must assess is the "reasonableness of using [the proffered] approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire Co. Ltd.*, 526 U.S. at 153-54 (emphasis in original). "'[A]ny step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*.'" *McClain v. Metabolite International, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (quoting *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)) (emphasis in original). Any of the above-identified flaws in the methodology Dr. Borjas proposes could, alone, render his analysis unreliable; together, they are fatal. Dr. Borjas's expert report is due to be stricken and, hence, his testimony excluded.

## C.   Defendants' Motion for Summary Judgment

Plaintiffs do not appear to contest that Dr. Borjas's report, and the proposed testimony it represents, is the only evidence before the court on the causation and damages elements of their cause of action.[206]   Because that report is due to be

---

[206] *See* doc. no. 111 (Response to Motion for Summary Judgment), at 59 ("If the Court denies [defendants' Motion to Exclude the Testimony of George Borjas], then Plaintiffs have put forth

excluded, defendants' motion for summary judgment is due to be granted on the basis that plaintiffs have failed to present evidence of damages and causation.

Plaintiffs' failure to causally link any wage depression that may have occurred to the RICO predicate acts, as § 1964(c) requires, is perhaps unsurprising, because plaintiffs have not provided sufficient evidence that the predicate offenses occurred *at all*.  In their complaint, plaintiffs alleged violation of two provisions of 8 U.S.C. § 1324(a) as possible predicate acts for their RICO claim.  First, they assert that defendants or their co-conspirators violated §1324(a)(3)(A) (the "hiring" provision), which makes it illegal, "during any 12-month period, [to] knowingly hire[] for employment at least 10 individuals with actual knowledge that the individuals are aliens as described in [§ 1324(a)(3)(B)]."  8 U.S.C. § 1324(a)(3)(A).  Section 1324(a)(3)(B), in turn, defines "alien" as (1) "an unauthorized alien" who is not either lawfully admitted for permanent residence or authorized to be employed, who (2) "has been brought into the United States in violation of [§ 1324(a)]."  8 U.S.C. § 1324(a)(3)(B).  The Eleventh Circuit has helpfully parsed this multiply-recursive

---

sufficient evidence that the Hiring Violations caused them to be paid less than they would have been paid had the Defendants not hired vast numbers of illegal aliens.").  Plaintiffs have pointed to no other evidence of causation and damages in their response to defendants' motion for summary judgment.  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds . . . not relied upon in summary judgment are deemed abandoned."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted).

language into its constituent elements and clarified their relationship to one another. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1292-93 (11th Cir. 2010).  For an employer to violate the section, he must not only hire ten individuals in a calendar year with actual knowledge that they are unauthorized for employment in this country, but must also have actual "knowledge that the alien was brought into the country illegally." *Id.* at 1293.

This final element is critical, as the Eleventh Circuit noted in *Edwards*, because it demarcates the distinction between a crime under the INA that "would be a RICO predicate act" and one that "would not be a RICO predicate act."  *Id.*  "'If the employer does not know that at least 10 of its illegal hires were 'brought into' the country by some third party (as opposed to walking across the border themselves, or arriving on a visitor's or student visa and outstaying their welcome), then it has not committed a RICO predicate act by hiring them . . . .'"  *Id.* at 1293 (quoting *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 534 (S.D.N.Y. 2009)).  The emphasis placed upon this element is a central part of the congressional design of both the INA itself and its selective incorporation § 1961(F) of RICO in 1996.  *Id.*  This court drew a particularly sharp line under this requirement very early in this case, "hold[ing] that the proper construction" of this provision required proof that defendants hired "ten or more individuals . . . with *actual knowledge* that such individuals have entered the

United States with some assistance or encouragement from another person."[207]

Assuming, *arguendo*, that plaintiffs have adduced sufficient evidence, through their immigration expert Johnston, to create a genuine dispute about whether defendants hired aliens with actual knowledge that they were unauthorized,[208] plaintiffs fail even to squarely argue defendants had actual knowledge those aliens were illegally brought into the United States. Indeed, tellingly, plaintiffs *never even use* the phrase "brought into" or any phrase with a similar meaning in the seven pages devoted to "actual knowledge" in their brief opposing summary judgment.[209]

Plaintiffs contend that "brought in" should be given a liberal interpretation to "include . . . . assistance of any kind, either prior to entry <u>or</u> after."[210] In support of this proposition, plaintiffs cite several cases from other circuits to suggest that "brought" has a broad meaning.[211] All of these cases are decidedly inapposite, as they each interpret *a different provision* that makes it illegal to "bring to the United States in any manner whatsoever" an alien who has not received prior authorization. *United States v. Gasanova*, 332 F.3d 297, 299-300 (5th Cir. 2003) (quoting 8 U.S.C. §

---

[207] Doc. no. 31 (Memorandum Opinion Denying Motion to Dismiss), at 35 (emphasis supplied).

[208] *See* doc. no. 106, Ex. A (Second Johnston Report), at 13 (opining, from a review of employee hiring documents, that 240 out of 1340 employees were not authorized to work in the United States).

[209] Doc. no. 111 (Response to Motion for Summary Judgment), at 29-36.

[210] *Id.* at 37 (emphasis in original).

[211] *Id.* at 37-38.

1324(a)(2)(B)); *United States v. Yoshida*, 303 F.3d 1145, 1151-53 (9th Cir. 2002);

*United States v. Aslam*, 936 F.3d 751, 755 (2d Cir. 1991).  The "in any manner

whatsoever" language does not appear in § 1324(a)(3)(A).  Yet it is precisely these

courts' recitation of that language to which plaintiffs point in urging this court to read

"brought into" in § 1324(a)(3)(A) as "assistance of any sort," including in obtaining

false documentation.[212]  This court need not determine, however, whether these

constructions of "bring[ing] to," extended as they are by that language, should be

coextensive with "brought to," actual knowledge of which is required to violate §

1324(a)(3)(A).  At most, the cases plaintiffs rely upon establish that facilitating the

illegal entry of an alien can constitute "bringing to," even if the defendant only

physically accompanied the aliens from the United States border to their immediate

destination.  *Aslam*, 936 F.3d at 755 (finding "meeting the aliens on the United States

side of the Canadian border and being available to drive them to some interior point"

sufficient to support a conviction under the "bringing to" prohibition); *see also*

*Yoshida*, 303 F.3d at 1152 (finding it irrelevant that defendant "did not actually pilot

the airplane to the United States" when the evidence established that "[s]he escorted

the aliens onto the airplane that eventually landed in the United States").  They

certainly do not hold that "assistance in obtaining stolen security numbers and other

---

[212] *Id.* at 37.

fake I.D.s in order to obtain employment at the plant," once an individual has established residence in the United States, would constitute "bringing in."[213]

Plaintiffs simply provide no admissible evidence whatsoever that even remotely suggests that defendants or their co-conspirators had actual knowledge that *any* individual they hired was "smuggled ('brought') into the United States," much less the ten in a calendar year that the statute requires. *Nichols*, 608 F. Supp. 2d, at 543. "An employer may know that it hired illegal aliens without knowing how they made their way into the United States," which would not violate the hiring provision. *Edwards*, 602 F.3d at 1294. Plaintiffs contend it is simply "common knowledge" that unauthorized aliens must obtain some help in coming to this country "because they cannot cross alone."[214] Were that sufficient, the "brought into" requirement would functionally be written out of the statute. Moreover, the Eleventh Circuit has noted multiple means by which aliens may come to this country without the variety of aid that the "brought into" element contemplates, including overstaying a student visa, walking across the border, or visiting as a tourist and remaining to work. *Id.* at 1294.

The closest plaintiffs come to providing even a scintilla of evidence directed to the "brought to" element is the declaration of a former Pilgrim's Pride employee,[215]

---

[213] *Id.* at 38.

[214] Doc. no. 111 (Response to Motion for Summary Judgment), at 38.

[215] Doc. no. 111, Ex. I, at 1-2.

which avers that the declarant overheard alleged co-conspirator, Sheila Walters, tell another employee to tell a crowd of Hispanic workers who had staged a walk-out during a unionization campaign the following:  "I know you have to get your papers right.  I can send you back just like I brought you here."[216]  This supposed admission is abject hearsay.  Plaintiffs assert, in a footnote elsewhere in their brief, that it should be admissible as a statement made by a co-conspirator made in furtherance of the conspiracy.[217]  *See* Fed. R. Evid. 802(d)(2)(E).  Plaintiffs fail entirely to support this bald assertion with even a single line of argument, as expressly required under the co-conspirator exception to the hearsay exclusion.  *Id.* ("The contents of the statement . . . are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein . . . ."); *see United States v. Underwood*, 446 F.3d 1340, 1346 (11th Cir. 2006) (proponent must present evidence tending to show "(1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course of and in furtherance of the conspiracy").  Further, given its terminal ambiguity, even if this statement were admissible, it would not create a genuine dispute as to whether ten individuals had been hired in a calendar year with actual knowledge they had been

---

[216] *Id.*

[217] Doc. no. 111 (Response to Motion for Summary Judgment), at 36 n.28.

brought into the country in violation of § 1324, as the statute requires.  Accordingly, plaintiffs' hiring violation claim fails as a matter of law.

Plaintiffs' claim based upon § 1324(a)(1)(A)(iii) (the "harboring" provision) as a predicate similarly fails to pass muster.  Concededly, there are dicta in *Edwards*, 602 F.3d 1276, suggesting that employment of an unauthorized alien may alone constitute "harboring" within the meaning of § 1324(a)(1)(A)(iii).  *Id.* at 1298-99. That case indicates that "knowingly employing illegal aliens alone" may be enough, based upon Congress's deletion of a proviso from the version of § 1324(a) that existed prior to 1986 which stated that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."  *Id.* at 1299 (citing 8 U.S.C. § 1324(a) (1982)).  Nonetheless, that portion of the opinion relies largely upon the reasoning of a Second Circuit decision, *United States v. Kim*, 193 F.3d 567, 573-74 (2d Cir. 1999), which held that *both* "conduct tending substantially to facilitate an alien's remaining in the United States illegally *and* to prevent government authorities from detecting his unlawful presence" were necessary elements of a harboring violation.  *Id.* at 574 (emphasis supplied); *cf. Edwards*, 602 F.3d at 1298-99 (citing *Kim*).  While *Kim* clearly establishes that employers may be liable under the section and that employment itself may be integral to this analysis, *Kim*, 193 F.3d at 572-74, the Second Circuit's evidentiary observations regarding

84

prevention of detection strongly indicate that knowing employment of an unauthorized immigrant, without more, would not be enough under the analysis they employed. *Id.* at 575 (discussing employer's "instruct[ions] to report falsely to INS" and to "obtain false documentation and to submit a[ misleading] I-9" as "permit[ting] the inference that [defendant] attempted to prevent [unauthorized alien's] continued presence from being detected by authorities"); *see also United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2008) (stating that mere knowing employment, absent some conduct indicating further inducement or encouragement, would not be enough).

The conclusion that § 1324(a)(1)(A)(iii) requires more than simple employment of an illegal immigrant is consistent with both the plain text and context of the provision. *E.g.*, *Wyeth v. Levine*, — U.S. —, 129 S. Ct. 1187, 1215 n.6 (2009) (reiterating the usual "impropriety of looking beyond the plain text"); *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (internal citations and quotation marks omitted)); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir. 1997) ("In construing a statute we must begin, and often should end as

well, with the language of the statute itself."). "In [this] circuit, '[w]hen the import of the words Congress has used is clear . . . we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language.'" *Shotz v. City of Plantation, Florida*, 344 F.3d 1161, 1167 (11th Cir. 2003) (quoting *United States v. Weaver*, 275 F.3d 1320, 1331 (11th Cir. 2001)).

Section 1324(a)(1)(A)(iii) makes it a crime to "knowing[ly] or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, *conceal*[], *harbor*[], or *shield*[] *from detection* . . . [an] alien in any place, including any building or any means of transportation . . . ." 8 U.S.C. § 1324(a)(1)(A)(iii) (emphasis supplied). Editions of *Black's Law Dictionary* that were roughly contemporaneous to Congress's revision of § 1324 into its current form defined "Harbor" as "to give shelter or refuge to," or "to receive clandestinely and conceal[]," and gives examples of "furnishing of shelter, lodging, or food clandestinely or with concealment . . . ." *Black's Law Dictionary* 847 (4th ed. 1951); *see also Black's Law Dictionary* 717 (6th ed. 1991) (same); *Webster's Third New International Dictionary* 1031 (1981) (defining "harbor" as "to give shelter or refuge to" and "to receive clandestinely and conceal").[218] The plain language reading of

---

[218] The court acknowledges that the Eighth Edition of *Black's Law Dictionary* (2004) specially defines "harboring of an illegal alien" as distinct from "harboring" in general to include "the act of providing concealment from detection by law-enforcement authorities or shelter, employment, or transportation to help a noncitizen remain in the United States unlawfully . . . ." *Id.*

"harbor" to require provision of shelter or refuge, or the taking of active steps to prevent authorities from discovering that the employee is unauthorized or illegally remaining in the country, should control.

This construction is bolstered by reading the provision in context with other revisions enacted alongside the current version of the harboring proscription. Section 1324(a)(3)(A), for example, provides a significantly lesser criminal penalty (a maximum of five years, as opposed to the maximum of ten years for violations of § 1324(a)(1)(A)(iii) for commercial benefit, under § 1324(a)(1)(B)(i)) for hiring an unauthorized alien when that hiring is done with *actual knowledge* that the alien was unauthorized *as well as* that he was brought illegally into the country, whereas § 1324(a)(1)(A)(iii) requires only reckless disregard of the illegal status of the alien. Absent clear and mandatory authority, this court will not impute such irrationality to Congress as to construe § 1324 to contain both a clearly applicable statutory provision with a lesser penalty and more stringent *mens rea* requirement and a statutory provision merely-implicitly-applicable to the *same conduct* with a greater penalty and more relaxed *mens rea* requirement. *See Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 196-197 (1980) (*per curiam*) ("Absent a far clearer expression

at 733. This definition, published eighteen years after § 1324 was drafted, is not controlling. Nor does it inherently contradict the construction adopted here. Employment of an alien alone, need not, and indeed often *will not* be "to *help a noncitizen remain in the United States* unlawfully," though there are obviously situations in which both conditions will be true. *Id.* (emphasis supplied).

of congressional intent, we are unwilling to read the Act as creating such a seemingly irrational . . . . system."). Further, the contemporaneously enacted provision 8 U.S.C. § 1324a(a)(1)(A) makes it "unlawful for a person or other entity . . . to hire . . . for employment in the United States an alien knowing the alien is an unauthorized alien," and provides for "criminal sanctions . . . [that] are much less stringent than those prescribed for a violation of § 1324." *United States v. Zheng*, 305 F.3d 1080, 1085 (11th Cir. 2002). While the Eleventh Circuit has counseled that the partial redundancy of these provisions should not be construed to *limit* the meaning of § 1324, it has regularly utilized the context of the entirety of the Immigration Reform and Control Act of 1986, Pub. L. NO. 99-603 (which revised fully § 1324 and created § 1324a), in construing the scope of the provisions contained therein. *E.g.*, *Zheng*, 305 F.3d at 1086-87 ("Congress understood th[e] problem [of illegal employment and its harmful effects] and chose to penalize employers for hiring illegal aliens and *harboring them from detection by providing transportation and housing* for them.") (emphasis supplied); *see also Edwards*, 602 F.3d at 1293 (discussing the distinctions between § 1324a(a)(1)(A) and § 1324(a)(3)(A) and noting that the "added element [of actual knowledge] makes a difference when it comes to penalty.").

Even assuming "harbor" is ambiguous, utilizing the "traditional tools of statutory construction" reinforces a construction of "harbor" that requires something

more than simple employment of an unauthorized worker in reckless disregard of that status. *Shotz*, 344 F.3d at 1167 ("If the statutory language is not entirely transparent, [courts should] employ traditional canons of construction before reverting to legislative history . . . ." (internal citations and quotation marks omitted) (alteration in original)). The canon of *noscitur a sociis* counsels in favor of an interpretation of "harbor" that is consistent with the other verbs with which it is in a series, namely "conceal[]" and "shield[] from detection." *Graham County Soil and Water Conservation District v. U.S. ex rel. Wilson*, — U.S. —, 130 S. Ct. 1396, 1402 (2010) (stating that the *nosictur* "maxim, literally translated as 'it is known by its associates,' counsels lawyers reading statutes that 'a word may be known by the company it keeps'" (internal citations omitted)). Both "conceal" and "shield" indicate some deliberate, affirmative interference with discovery, a quality "harbor" can readily be construed to share when read as providing shelter, transportation, or other aid in avoiding detection (such as directing an alien where she might purchase false citizenship documents). Simple employment, however, even if done with knowledge of an alien's status as such, does not of itself share this connotation. Further, even were the word terminally ambiguous, because § 1324 is a penal statute, the rule of lenity would counsel strongly that it be construed in favor of defendants, a reading that comports wholly with the principle dictionary definition and would exclude mere

employment. *United States v. Santos*, 553 U.S. 507, 514 (2008) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

This reading is also in accord with all examined holdings in the Eleventh Circuit as well as other Circuits. *E.g.*, *Edwards*, 602 F.3d at 1299 (holding employing illegal along with "provid[ing] them with social security numbers and names, and pa[ying] them in cash in order to conceal, harbor, and sheild the[m] from detection" sufficient); *United States v. Cuevas-Reyes*, 572 F.3d 119, 122 (3d Cir. 2009) ("[W]e adopted the test of our sister circuits:  'harboring, within the meaning of § 1324, encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence.'" (quoting *Kim*, 193 F.3d at 574)); *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008) ("'Harboring' means any conduct that substantially facilitates an alien's remaining in the United States illegally," such as "by granting them employment, by providing the aliens a place to live, daily transportation, and money to purchase necessities, and by maintaining counterfeit immigration papers for each alien"); *United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007) (requiring, as a necessary element of a harboring violation, proof that "the defendant's conduct tended to substantially facilitate the alien remaining in the United States illegally");

*Zheng*, 306 F.3d at 1086 (finding sufficient evidence that defendants "harbored the illegal aliens by providing *both* housing *and* employment") (emphasis supplied). Accordingly, while it is clear that the act of employing an illegal alien may be significant evidence that an employer has harbored an unauthorized alien in violation of §1324, unless that employer has provided further material aid constituting "substantial facilitation," that alone is not sufficient.

Under this construction, plaintiffs' harboring claim must fail as a matter of law. In their complaint, plaintiffs contended defendants violated § 1324(a)(1)(A)(iii) by conspiring to provide free housing and transportation to illegal immigrants and by employing them.[219] As the statutory analysis above indicates, the crux of plaintiffs' harboring claim must be proof that defendants provided free housing and transportation. Plaintiffs concede, in a footnote, that "they do not have sufficient evidence of transporting," and all but admit they have insufficient competent evidence defendants housed unauthorized workers. The only evidence to which plaintiffs point suggesting that defendants (or their alleged co-conspirators) provided room and board to unauthorized immigrants is the testimony of plaintiff Hall.[220] She indicated that Pilgrim's Pride "was housing [illegal immigrants] for four weeks . . .

---

[219] Doc. no. 49 (Second Amended Complaint), ¶¶ 24, 28, 35.

[220] *See* doc. no. 111 (Response to Motion for Summary Judgment), at 13 ¶ 52, 48 n.39.

to help them get up on their feet[].”[221]  Hall provided two bases for this belief.  First, she indicated that she once saw a company van pick up workers of Hispanic ethnicity at a trailer park and transport them to the facility.[222]  However, she provides no basis whatsoever to believe these individuals were unauthorized to work in this country. Moreover, her testimony suggests that the occurrence was so rare that “[e]verybody was talking about it within the plant.”[223]  Second, she states that the basis for her belief that the company provided housing and perhaps transportation to unauthorized workers was that she “talked to a Hispanic on night shift” — and “whether it was a rumor or the truth, he’s the one that said it.”[224]  Hence, her belief is patently based upon hearsay.  Indeed, Hall candidly admits that she has no “personal knowledge” that plant managers directed staff to arrange for free temporary room and board or transportation.[225]  Plaintiff Hall’s unsupported belief that the company provided housing to unauthorized immigrants, premised purely on hearsay and speculation, cannot indicate defendants engaged in activity constituting “harboring.”

Plaintiffs also proffer a new factual theory of a purported harboring violation

---

[221] Doc. no. 104, Ex. 6 (Deposition of Jennifer Hall) [hereinafter Hall Deposition], at 299; *see generally id.* at 286-300.

[222] *Id.* at 290-297.

[223] *Id.* at 294.

[224] *Id.* at 298.

[225] *See id.* at 286, 299-300.

to oppose defendants' motion for summary judgment that was not contained in their

second amended complaint: *i.e.*, that defendants or their co-conspirators "tipped off"

unauthorized workers prior to raids by immigration officials.[226]   Such an action,

presumably, would violate § 1324(a)(1)(A)(iii).   However, upon inspection, the

evidence plaintiffs rely upon for this new allegation fails entirely to implicate

defendants.   Plaintiffs first point to plaintiff Rocha's deposition and interrogatory

answers, wherein he asserts that "Carlos and Benito Chavez, lead men, they have

knowledge about tipping off known illegal workers prior to INS raids . . . ."[227]   Rocha

clarified that this referred to a man named Carlos Baltizar who, at an unknown point

in 1997 or 1998, stated that immigration officials were "coming to Russellville."[228]

Plaintiffs, however, make no attempt to link these two individuals to defendants or

the conspiracy they allege.[229]   Hence, it is entirely unclear how such evidence could

support a harboring violation that would, as plaintiffs assert, "establish a pattern of

racketeering [in violation of ] § 1961(5)."[230]   Plaintiffs attempt to shore up their

---

[226] Doc. no. 111 (Response to Motion for Summary Judgment), at 48.

[227] Doc. no. 104, Ex. 5 (Deposition of Jose Rocha) [hereinafter Rocha Deposition], at 402; doc. no. 111, Ex. 5, Ex. 38 (Plaintiff Rocha's Responses to Defendants' First Set of Interrogatories), ¶ 1.

[228] Rocha Deposition, at 403-05.

[229] *See id.* at 406.   Carlos Baltizar seems to appear nowhere else in the record.

[230] Doc. no. 111 (Response to Motion for Summary Judgment), at 49.   Indeed, it appears that the *only* admissible evidence of any party engaging in activities that could be considered harboring is plaintiff Rocha's admission that he drove individuals to the Russellville facility to apply for work, knowing that they had purchased false identification documents from his then-roommate Antonio

"tipping off" contention by suggesting Hall's testimony corroborates the assertion. It blatantly does not.[231]   At most, plaintiff Hall indicates that she saw some "Hispanics," though she cannot remember how many, hiding on the one occasion during her fifteen year tenure, in "the later '90s or the early 2000s," when immigration officials came to the Russellville facility.[232]  She expressly states that she did not hear anyone, much less either defendant or any alleged co-conspirators, telling them to do so.[233]   Beyond that, she only indicates that there were occasionally "rumors" that immigration officials would be in town and that, on those days, workers in her department would be absent.[234]   Only abject speculation could render this evidence of a harboring violation attributable to defendants.[235]

---

Valesquez.  Rocha Deposition, at 154-57.  *Cf. Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152-56 (11th Cir. 2006).

[231] Doc. no. 111 (Response to Motion for Summary Judgment), at 49.

[232] Hall Deposition, at 362-67.

[233] *Id.* at 366.

[234] *Id.* at 409-12.  It is also notable that Plaintiff Hall admitted that some of the four occasions during the 2000s when, she testified, rumors of INS raids caused excessive absenteeism coincided with days during which "the Hispanic people were on the march." *Id.* at 410.  That is, those were days on which equal rights marches by Hispanic workers or parades in favor of unionization had occurred.  *See id.* at 319-21.

[235] Plaintiff Hall expressly disavowed, as information not within her personal knowledge and *not even provided by her*, an answer to defendants' interrogatories propounded to her that was identical to the "tipping off" quotation provided above.  Hall Deposition, at 388.  This is one of no fewer than *thirteen distinct times* during her deposition when plaintiff Hall testified that she had no personal knowledge of, nor had provided the information contained in, her sworn answers to interrogatories.  *Id.* at 388, 393, 396-404, 408, 414-16.  This is so, despite that fact that several of the interrogatory answers expressly asserted that she had "personal knowledge" of certain facts she later disavowed.  *Id.* at 402-03.  Plaintiffs' Counsel Foster signed the interrogatory response.  Doc. no. 111, Ex. 6, Defendants' Exhibit 12 (Plaintiff Jennifer Hall's Response to Defendant's First Set

Accordingly, and in the alternative, defendants' motion for summary judgment is due to be granted because plaintiffs have failed to submit competent evidence of a pattern of racketeering conduct — that is, evidence from which a jury could find that defendants "commit[ted] at least two distinct but related predicate acts." *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1283 (11th Cir. 2006)

## IV.  CONCLUSION

As a matter of policy, there is great appeal to the argument that the problem of illegal immigration in this country may best be dealt with by holding accountable those whose actions create much of the incentive for unauthorized immigrants to flood into the United States, namely, the employers who hire them.  *See Affordable Housing Foundation, Inc. v. Silva*, 469 F.3d 219, 231 (2d Cir. 2006) ("Employment is the magnet that attracts aliens here illegally.").  Given the scarce resources available, deputizing private citizens through the mechanisms of RICO, likewise, makes a great deal of practical sense.  *See Williams*, 465 F.3d at 1290 ("It is consistent with civil RICO's purposes — to expand enforcement beyond federal prosecutors with limited public resources — to turn victims (here, Mohawk's legal workers) into prosecutors as private attorneys general seeking to eliminate illegal

---

of Interrogatories), at 12.  Notwithstanding the requirements of Federal Rule of Civil Procedure 22(b)(1)(a), Hall did not.  This court is not in the least amused by the extra layer of confusion injected into an already voluminous and convoluted record by plaintiffs' fast-and-loose approach to the requirements of Federal Rules of Civil Procedure 33(b)(1), (5) and 26(g).

hiring activity by their own employer."). Yet "whatever the merits of [those] arguments as a policy matter, [this court] is not at liberty to rewrite RICO [or, for that matter, the Immigration and Nationality Act] to reflect . . . views of good policy." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 660 (2008). Plaintiffs have not provided sufficient evidence in support of their claims to create a genuine issue of material fact as to whether defendants violated the relevant provisions of the Immigration and Nationality Act, and, whether they were damaged "by reason of" those violations. 18 U.S.C. § 1964(c).

Accordingly, and in light of the foregoing, it is ORDERED, ADJUDGED, and DECREED that: defendants' Motion for Summary Judgment and Motion to Exclude the Testimony of George Borjas are due to be, and the same hereby are, GRANTED; and that all claims of plaintiffs be, and the same hereby are, dismissed with prejudice. Plaintiffs' Motion for Further Discovery pursuant to Rule 56(f) is DENIED. Defendants' Motion to Exclude the Testimony of James M. Johnston and plaintiffs' Motion to Amend or Correct the Scheduling Order are both DENIED, as moot. Costs are taxed to plaintiffs. The Clerk is directed to close this file.

DONE and ORDERED this 29th day of November, 2010.

_____
United States District Judge